## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| _____ : | | |
| CEDAR RAPIDS LODGE & SUITES, LLC : | | |
| and : | | |
| JAMES T. RYMES : | | |
| RHONDA COBORN : | | |
| MICHAEL COBORN : | | |
| SCOTT SHISLER : | | |
| JULIE SHISLER : | | |
| PAMELA J. COBB REVOCABLE TRUST : | | |
| RAYMOND MULFORD : | | |
| THERESA A. MULFORD : | CASE NO. 1:09-cv-00175 | |
| JACOB SAILER : | | |
| RONALD SAILER; and : | | |
| JERRED RUBLE : | VERIFIED COMPLAINT | |
| By direct action in their individual capacities : | AND PETITION FOR | |
| : | EQUITABLE RELIEF | |
| PLAINTIFFS : | | |
| : | | |
| v. : | **JURY TRIAL** | |
| : | **REQUESTED** | |
| JFS DEVELOPMENT, INC. (f/k/a JCS : | | |
| DEVELOPMENT, INC.) : | | |
| JOHN F. SEIBERT : | | |
| TED VOSBURG : | | |
| MARC GABRIELSON : | | |
| LIGHTOWLER JOHNSON ASSOCIATES, INC. : | | |
| : | | |
| DEFENDANTS : | | |
| _____: | | |

NOW COME the Plaintiffs, the Cedar Rapids Lodge & Suites, LLC, and on

certain enumerated direct-action counts, James T. Rymes, Rhonda Coborn, Michael

Coborn, Scott Shisler, Julie Shisler, The Pamela J. Cobb Revocable Trust, Raymond

Mulford, Theresa Mulford, Jerred Ruble, Jacob Sailer and Ronald J. Sailer in their

individual capacities, by and through their attorneys, and for their causes of action state:

# I. INTRODUCTION

1.    Plaintiffs bring this action against individual and corporate Defendants whose fraud, self-dealing, negligent construction, mismanagement and breaches of fiduciary duty in connection with the construction and operation of a Cedar Rapids-based AmericInn[1] hotel have cost the Plaintiffs at least $736,601.00 that can be accounted for with certainty as of the date of this complaint.  This number is expected to grow significantly higher once discovery occurs and the extent of the Defendants' wrongdoing and the Plaintiffs' liabilities to third parties resulting from the Defendants' actions can be fully ascertained.

2.    Defendants' scheme, committed through a pattern of racketeering activities, was the brainchild of Defendant John Seibert ("Seibert"), and has been replicated at several other AmericInn hotels across the United States.  Pursuant to this scheme, Seibert, Ted Vosburg ("Vosburg") and Marc Gabrielson ("Gabrielson") appointed themselves founding Governors of the proposed hotel, and then induced a number of investors (here, the individually-named Plaintiffs), through a series of material fraudulent misrepresentations and omissions discussed more specifically below, to invest in an AmericInn franchised hotel - in this case, the AmericInn Cedar Rapids Lodge & Suites.

3.    In an effort to induce investment and to reassure potential investors of the soundness of the proposed project, Seibert, Vosburg and Gabrielson represented to the Plaintiff-investors on a number of occasions, both orally and in writing, that Seibert, Vosburg, Gabrielson and the project's general contractor, Timothy T. Tyrrell, were all

---

[1] AmericInn is a franchisor of hotels primarily in the midwestern United States with a principal place of business at 250 Lake Drive East, Chanhassen, MN  55317.

2

making significant initial capital contributions to the project along with the other investors.

4.      The Subscription Agreement for the AmericInn Cedar Rapids Lodge & Suites, signed by all investors, represented that Seibert, Vosburg and Gabrielson were all making $50,000.00 capital contributions to the project, and that Tyrrell was making a $100,000.00 capital contribution to the project.  The Defendants also represented in writing to the investors, in a "confidential" offering document, that the Cedar Rapids Lodge & Suites would feature a 25% equity contribution from the investors, with the remaining 75% financed through a construction loan.  The total of all outside investor dollars actually committed to the AmericInn Cedar Rapids Lodge & Suites, coupled with Seibert, Vosburg, Gabrielson and Tyrrell's stated investments, was to comprise this 25% equity stake.

5.      Neither Seibert, Vosburg and Gabrielson (the project's founding Governors), nor Tyrrell, the project's general contractor (and also a founding Governor), ever intended to make their stated capital contributions to the project.  Instead, in furtherance of their scheme, Seibert, Vosburg, Gabrielson and Tyrrell would "free-ride" on the backs of the committed investors, obtaining their stakes in the LLC without ever contributing any of their own seed capital, and knowing that because they controlled the books, the trail of initial seed money would be "lost" in the scope of the project. Unbeknownst to its other investors, but with the Defendants' full knowledge, this also resulted in the Cedar Rapids Lodge & Suites being $250,000 undercapitalized from the beginning.

3

6.     The Defendants then furthered their scheme by self-dealing and entering into a series of undisclosed, self-serving documents and agreements, discussed more fully below. These agreements allowed the founding Governors to transact business on behalf of the hotel, and to attempt to insulate themselves from personal liability to the LLC or its members for monetary damages for their breaches of fiduciary duty, errors of judgment, or acts or omissions. The Defendants failed to disclose these agreements or their self-serving terms to the project's investors either before or after the investors committed to the project. The nondisclosure of these operating documents kept the investors in the dark as to the degree of control they maintained over the founding Governors, and the rights they had to control decision making. This nondisclosure, by and large, allowed the founding Governors to act with impunity.

7.     Seibert, Vosburg and Gabrielson replicated this scheme with many other unsuspecting investors in a series of other AmericInn hotels, free-riding on the capital provided by the people they induced to invest, and giving themselves significant equity positions in each of these hotels at no cost to themselves. Their larger plan was to accumulate enough of these cost-free equity positions to live on the anticipated profit distributions from the hotels until the mortgages could be paid off and the hotels sold, either individually or together as a conglomerate – producing a windfall profit large enough for the Defendants to retire on.

8.     The Defendants' scheme began to unravel on October 16, 2008, when Defendants Seibert, Vosburg and Gabrielson could not account for additional monies contributed by the investors in the prior year, the Plaintiffs pooled their voting shares of the LLC, overthrew Seibert, Vosburg and Gabrielson, and installed new Governors.

4

Since then, the Plaintiffs, led by these new Governors, have uncovered a staggering

degree of fraud, negligence, mismanagement, and other unlawful activity previously

unknown and/or undisclosed to the investors, and described more fully below including:

(1) the hotel not being constructed according to AmericInn design standards, but instead,

using cheaper, unapproved materials, risking the hotel's franchise affiliation; (2) the hotel

being appointed with non-commercial grade furniture, fixtures and equipment in

violation of AmericInn design standards; (3) the City of Cedar Rapids' refusal to issue a

final certificate of occupancy to the hotel due to rampant construction problems and code

violations that remained unresolved; (4) the hotel having operated for most of its five

years without even a Temporary Certificate of Occupancy, putting all of the investors at

risk of (a) the City of Cedar Rapids shutting down the hotel and causing a default on the

hotel's bank loan, which each investor had personally guaranteed for three times his/her

investment; or (b) liability for a claim by anyone injured on the premises which would be

uninsured due to the lack of a certificate of occupancy; (5) extreme construction cost

overruns running into the hundreds of thousands of dollars with no performance bond in

place to protect against these overruns; (6) nearly $100,000 of unpaid taxes; (7) over

$200,000 of unpaid franchise fees to AmericInn and a default letter from AmericInn

threatening to revoke the franchise due to these fees; (8) undocumented loans to and from

the hotel; (9) substantial and unnecessary interest and penalty payments; (10) misdirected

management fees; (11) significant cash drawer shortfalls;  (12) unexplained

miscellaneous spending; and (13) discrepancies between actual and reported occupancy

rates.  Plaintiffs have even uncovered "special room arrangements" with strippers from a

5

nearby "gentlemen's clubs" and the fact that the hotel's on-site manager and at least two of the founding Governors were aware of these arrangements.

9.     To date, Plaintiffs have been stymied in their effort to uncover the full extent of the Defendants' fraud, self-dealing and mismanagement because, after the change of control on October 16, 2008, on the orders of Defendant Seibert and unbeknownst to the hotel's new Governors, the hotel's then-manager packed up several bankers boxes with unspecified hotel-related documents.  These documents were then removed from the hotel by Kevin McPherson, the Vice-President of Seibert's hotel management company JCS Development, Inc.

10.     Plaintiffs bring this action against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations statute ("RICO"), 18 U.S.C. §§1961 through 1968, and the Consumer Fraud Act.  Plaintiffs also plead common law causes of action including: a petition for accounting, petitions for declaratory judgment to invalidate agreements and contracts, and actions for mismanagement, negligence, fraud, fraudulent nondisclosure, negligent misrepresentation, breach of fiduciary duty and waste/misappropriation of corporate assets.

11.     Plaintiffs seek the return of their initial investments and subsequent capital call investments delivered to the Defendants, damages, treble damages, punitive damages, pre-judgment interest, costs, attorney's fees and all other relief deemed appropriate by this Court.

6

## II.    JURISDICTION

12.    This Court has subject matter jurisdiction over this matter pursuant to RICO, 18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiffs' claims arise under the laws of the United States, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

## III.    VENUE

13.    Venue is proper in the Northern District of Iowa pursuant to 18 U.S.C. § 1965(a) and 18 U.S.C. § 1391 in that the AmericInn Cedar Rapids Lodge & Suites is located in the Northern District of Iowa, and Defendants transacted business, negotiated agreements, entered into contractual agreements, and held investors meetings in the Northern District of Iowa.  Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965(b) because even though some Defendants reside outside of this district, the ends of justice require that such Defendants be brought before this court.

## IV.    THE PARTIES

14.    Plaintiff CEDAR RAPIDS LODGE & SUITES, LLC is a Minnesota Limited Liability Corporation with a registered office at 13941 Vinewood Lane, Dayton, MN 55327 and a principal place of business at 8910 6th Street SW, Cedar Rapids, IA 52404.  The hotel's current Governors are Plaintiffs James T. Rymes, Rhonda Coborn and Scott Shisler.  Except as otherwise specifically stated in the enumerated counts below, this case is brought by the managing Governors of the Cedar Rapids Lodge & Suites, LLC, on behalf of the LLC, against the named Defendants.

15.    Plaintiff JAMES T. RYMES is an individual domiciled at 43 Miltimore Rd., Antrim, New Hampshire 03440.

16.     Plaintiffs RHONDA COBORN and MICHAEL COBORN are a married couple domiciled at 21 South Willowgreen Ct., Mason City, IA 50401.

17.     Plaintiffs SCOTT SHISLER and JULIE SHISLER are a married couple domiciled at 116 Preserve Court, Lindenhurst, IL 60046.

18.     Plaintiff PAMELA J. COBB REVOCABLE TRUST is a trust administered by Pamela J. Cobb, Trustee, with a mailing address of 5095 South Shore Drive, Clear Lake, IA 50428.

19.     Plaintiffs RAYMOND MULFORD and THERESA MULFORD are a married couple domiciled at 404 Brickyard Road, Sheffield, IA 50475.

20.     Plaintiff JERRED RUBLE is an individual domiciled at 754 342nd Street, Hanlontown, IA 50444.

21.     Plaintiff JACOB SAILER is an individual domiciled at 1581 110th Street #C, Hampton, IA 50441.

22.     Plaintiff RONALD J. SAILER is an individual domiciled at 694 Quail Ave., Geneva, IA 50633.

23.     Defendant JFS DEVELOPMENT, INC. (f/k/a JCS DEVELOPMENT, INC.)(hereinafter "JCS") is a Minnesota hotel management corporation with a principal place of business at 13941 Vinewood Lane, Dayton, MN 55327. Defendant John F. Seibert serves as its President.

24.     Defendant JOHN F. SEIBERT is an individual with a business address of 13941 Vinewood Lane, Dayton, MN 55327, and was an original Governor of the AmericInn Cedar Rapids Lodge & Suites.

25.     Defendant TED VOSBURG is an individual with a mailing address of PO Box 376, Hampton, IA 50441, and was an original Governor of the AmericInn Cedar Rapids Lodge & Suites.

26.     Defendant MARC GABRIELSON is an individual with a business address of 231 East Main St., Belmond, IA 50421, and was an original Governor of the AmericInn Cedar Rapids Lodge & Suites.

27.     Defendant LIGHTOWLER JOHNSON ASSOCIATES, INC. is a North Dakota architectural and engineering corporation with a principal place of business at 700 Main Avenue, Fargo, North Dakota, 58103, and was the project architect for the AmericInn Cedar Rapids Lodge & Suites.

## V.     BACKGROUND

### Origins of the Seibert/Vosburg/Gabrielson Partnership

28.     On July 3, 1998, Ted Vosburg ("Vosburg"), a mechanical engineer and propane equipment sales company owner, and his then-wife Margery Ann, opened an AmericInn hotel in Hampton, IA.

29.     Shortly thereafter, Marc Gabrielson ("Gabrielson"), the owner of a local catering business known as We3 Catering Company in Belmond, IA, visited Vosburg's Hampton, IA hotel to solicit business and to inquire about becoming involved in the construction of another AmericInn hotel, possibly in Cedar Falls, IA. Cedar Falls is home to the University of Northern Iowa and a large industrial park.

30.     Vosburg was interested in building and opening another AmericInn hotel in Ankeny, IA, and invited Gabrielson to that proposed site. Jon Kennedy, AmericInn's

9

Senior Vice-President of Franchise Development and Seibert, a former pilot for AmericInn's flight division, accompanied them to Ankeny.

31.    Ted and Margery Ann Vosburg decided to build the AmericInn in Ankeny, IA.

32.    Vosburg and Gabrielson visited the Cedar Falls site and later contacted Seibert and arranged for a meeting.

33.    The three met in Clear Lake, IA and agreed to build and operate an AmericInn at Cedar Falls.

34.    This was the beginning of the partnership between Seibert, Vosburg and Gabrielson that would later give rise to the construction of the Cedar Rapids Lodge & Suites and several other AmericInn hotels.

35.    Pursuant to this partnership, Seibert facilitated site selection and approval through his connections, familiarity with, and insider knowledge of the AmericInn site selection and franchising process, and Seibert, Vosburg and Gabrielson were responsible for finding the investors needed to capitalize each new hotel project.

**Seibert/Vosburg/Gabrielson Acquire Cedar Rapids Franchise Rights**

36.    Seibert, Vosburg and Gabrielson identified Cedar Rapids as another favorable location for an AmericInn.  Upon investigation, however, Seibert learned that the exclusive right to develop an AmericInn franchise in Cedar Rapids had been granted to Vern Cooper and Tyrrell through an entity known as Midwestern Hospitality, Inc. on February 13, 2001.

37.     Upon information and belief, Seibert then began negotiations with Tyrrell to determine how to acquire the AmericInn franchise rights from Midwestern Hospitality, Inc.

38.     On March 18, 2003, John F. Seibert executed Articles of Organization for the Cedar Rapids Lodge & Suites, LLC pursuant to Minnesota Statutes Chapter 322B, appointing himself as the LLC's Chief Manager.  The Articles named Seibert, Vosburg, Gabrielson and Tyrrell[2] as founding Governors, which allowed them to transact further business on behalf of the LLC.  The Articles also included a provision purporting to insulate the aforementioned Governors from personal liability to the LLC or its members for monetary damages for breach of fiduciary duty.

39.     These Articles of Organization were never provided to the Plaintiffs before or after the Plaintiffs made their investment decisions.  Although the Articles of Organization were filed with the Minnesota Secretary of State's office on May 19, 2003, which allowed Seibert, Vosburg and Gabrielson to start selling ownership shares in the LLC, they were not filed with the State of Iowa Secretary of State's office (where someone looking for them would expect to find them) until August 26, 2003, after all of the Plaintiffs had made their initial capital contributions.

40.     On April 25, 2003, pursuant to a "Consent to Transfer of Franchise Rights" agreement, Tyrrell, Vern Cooper and their corporation, Midwestern Hospitality, Inc., transferred their exclusive franchise rights to operate an AmericInn in Cedar Rapids, Iowa to the Cedar Rapids Lodge & Suites, LLC.  The transfer was accepted by Seibert on

---

[2] The Plaintiffs have not sued Tyrrell because Tyrrell recently filed for bankruptcy and appears to be judgment proof.

behalf of the Cedar Rapids Lodge & Suites, LLC on May 9, 2003, and approved by AmericInn on August 11, 2003.

41.     On August 11, 2003, the Cedar Rapids Lodge & Suites, LLC entered into a Franchise Agreement with AmericInn International, LLC which required Cedar Rapids Lodge & Suites, LLC to pay to AmericInn International an initial franchise fee of $25,000.00 and then (1) a "Continuing Fee" equal to 5 percent of monthly gross revenues; and (2) an additional fee equal to 2 percent of monthly gross revenues as a contribution to AmericInn's national marketing campaign.  Upon committing to their investments, the Plaintiffs were required to sign personal guaranty agreements to be bound personally for these franchise fees according to their pro rata ownership share of the hotel.

### Seibert Hires Tyrrell as General Contractor

42.     Shortly after the Cedar Rapids Lodge & Suites, LLC acquired the AmericInn franchise rights from Midwestern Hospitality, Inc., Tyrrell began functioning as the General Contractor for the Cedar Rapids Lodge & Suites, lining up subcontractors and preparing for foundation work.

43.     Upon information and belief, Tyrrell was chosen as General Contractor and given a $100,000 equity share in the hotel as consideration for his share of the exclusive AmericInn franchise rights to the Cedar Rapids geographical area.

44.     Tyrrell was never exposed to a competitive bidding process or any other method of due diligence before being selected by Seibert as the project's General Contractor.

45. The Plaintiffs never had any opportunity to scrutinize Tyrrell's credentials other than by reading the information about Tyrrell that Seibert, Vosburg and Gabrielson disseminated to the Plaintiffs while attempting to induce investments from them. The Plaintiffs relied on these representations, had no knowledge of Tyrrell's prior claim to the Cedar Rapids AmericInn franchise, and had no reason to suspect, at the time they invested, that Tyrrell had not been subjected to proper due diligence by the Defendants, or that the representations made about Tyrrell by the Defendants were not truthful and accurate.

46. The materials distributed to the Plaintiffs by Seibert, Vosburg and Gabrielson while soliciting their investments touted Tyrrell as having "over 24 years of experience in developing, managing and constructing commercial construction projects ranging in size from 500K to 7.5 million," and noted that The Tyrrell Companies, LLC had "a clear understanding of the construction of this type of building."

47. In fact, the Tyrrell Companies, LLC had never developed, managed or constructed a single commercial construction project of any size prior to the Cedar Rapids Lodge & Suites. According to a November 2003 decision[3] issued by the Court of Appeals of Iowa at the time Tyrrell was working on the hotel's foundation, the Tyrrell Companies were "in the business of building single family dwellings."

48. The written materials distributed to investors by Seibert, Vosburg and Gabrielson while soliciting their investments in the project also touted Tyrrell's ability, dedication and commitment to providing a "high quality product." Yet at the time these representations were made, Seibert knew that Tyrrell had been convicted by an Iowa jury

[3] Tyrrell Companies, LLC a/k/a Timm Tyrrell Construction, LLC v. Tegeler Design Center, Inc. d/b/a Tegeler Design & Remodeling, No. 3-756/03-0258 (Court of Appeals of Iowa, Nov. 26, 2003).

Case 1:09-cv-00175-LRR   Document 1   Filed 12/03/09   Page 13 of 98

and done jail time for assault causing bodily injury, and that Tyrrell had also recently

been charged with felony theft – a crime of integrity plainly relevant to his

trustworthiness and capacity to administer a $2.4 million dollar construction loan without

supervision.  Tyrrell pled guilty and received a misdemeanor conviction in the Faribault

District Court in Minnesota, in exchange for a $56,000 restitution order, and 10 years

probation, which he was still serving at the time Seibert decided to make him the General

Contractor for the project.

49.     During AmericInn's review of the franchise transfer in 2003, Jon

Kennedy, AmericInn's Senior Vice-President for Development, warned Seibert that

Tyrrell had done jail time, and that Tyrrell was ill-suited to serve as the project's General

Contractor and would need to be watched closely.  Seibert shared these facts with

Vosburg and Gabrielson, but none of the three disclosed these material facts to the

Plaintiff-investors.

<u>**Misrepresentations Made to Plaintiff-Investors**</u>
<u>**About Initial Project Capitalization and**</u>
<u>**Defendants' Initial Cash Investments in the Project**</u>

50.     From May to July 2003, Seibert, Vosburg and Gabrielson approached

potential investors about the Cedar Rapids AmericInn hotel investment opportunity.  To

induce individuals to invest, Seibert, Vosburg and Gabrielson variously stated that they

were putting "their own money" into the project, or had put their "entire retirement

savings" into the Cedar Rapids Lodge & Suites and/or various other AmericInn hotels

managed by JCS, and therefore, the investors could be confident both in the soundness of

the investment, and that Seibert, Vosburg and Gabrielson, as Governors of the hotel,

could be relied on to manage the hotel successfully and protect the Plaintiffs' investment.

51.     During this solicitation process, Seibert had also prepared and Vosburg and Gabrielson distributed to potential investors, a confidential document introducing the project and stating, among other things, that the developers of the property (Seibert, Vosburg and Gabrielson) were "pooling their resources" to develop the project, and that the overall investment group, including the developers and the investors, would be "putting 25% equity into the development of the property."

52.     Certain of the Plaintiffs were shown an investment analysis for the project showing that the Cedar Rapids AmericInn hotel project was anticipated to cost $3,420,000.00 to build-out (including the purchase of the land and the furniture, fixtures and equipment), of which 25 percent ($855,000) would come from investor equity, and the remainder ($2,565,000) would be financed with a 20-year loan at a fixed interest rate of 6.35 percent.  This arrangement was also explained to various investors by Vosburg and Gabrielson.

53.     These representations were all knowingly false.  Seibert, Vosburg and Gabrielson all knew that pursuant to the investment scheme they were perpetrating, none of them, nor Tyrrell, would be contributing any cash into this, or any of the other hotels in their overall investment scheme.  None of the Defendants made capital contributions or subsequent capital calls to the Cedar Rapids Lodge & Suites, as the hotel's project account at Liberty Bank in Cedar Rapids confirms.   It was nowhere disclosed that the developers' shares and Tyrrell's shares were intended to be paper shares.

54.     As a result, Seibert, Vosburg and Gabrielson also knew that their representation that the investment group would be "putting 25% equity into the development of the property" was false, since Seibert, Vosburg, Gabrielson and Tyrrell's

disclosed shares of the LLC (totaling $250,000.00) were part of the anticipated 25 % equity contribution, but did not actually produce any cash for the project.

55.     As such, in furtherance of their scheme, Seibert, Vosburg and Gabrielson each obtained a $50,000 stake in the Cedar Rapids Lodge & Suites, LLC, and Tyrrell obtained a $100,000 stake without ever contributing any of their own capital. Unbeknownst to the Plaintiffs, but with the Defendants' full knowledge, this resulted in the Cedar Rapids Lodge & Suites being undercapitalized by $250,000.00 from the beginning.

56.     The above-named Plaintiffs (and the other investors who are now deceased or did not respond) made initial investments in the hotel totaling $550,000.00 as follows:

| Name | Investment | Profit/Loss Percentage | Voting Percentage |
| --- | --- | --- | --- |
| Jacob L. Sailer | $58,000.00 | 6.82 | 6.82 |
| James T. Rymes | $100,000.00 | 11.76 | 11.76 |
| Pamela J. Cobb, Trustee | $35,000.00 | 4.12 | 4.12 |
| Jerred Ruble | $35,000.00 | 4.12 | 4.12 |
| Robert Krieger | $35,000.00 | 4.12 | 4.12 |
| Ray Mulford | $50,000.00 | 5.88 | 5.88 |
| Michael & Rhonda Coborn | $112,000.00 | 13.18 | 13.18 |
| Ronald J. Sailer | $25,000.00 | 2.94 | 2.94 |
| Robert Kopriva | $50,000.00 | 5.88 | 5.88 |
| Scott & Julie Shisler | $50,000.00 | 5.88 | 5.88 |

57.     Maurice Vosburg (Defendant Ted Vosburg's father), who is not an

individual plaintiff in any of the direct-action counts in this lawsuit, also purportedly

made an initial cash investment of $50,000.00 as shown below:

| Name | Investment | Profit/Loss Percentage | Voting Percentage |
|------|-----------|------------------------|-------------------|
| Maurice Vosburg | $50,000.00 | 5.88 | 5.88 |

58.     As such, the hotel was initially capitalized with only $600,000 in investor

cash, rather than the $855,000 stated in the materials disseminated to the investors – an

undercapitalization of 30 percent which was never disclosed to the Plaintiffs nor to

Liberty Bank, which was underwriting the project's construction loan.

59.     The non-cash-backed investment interests in the hotel are summarized as

follows:

| Name | Investment | Profit/Loss Percentage | Voting Percentage |
|------|-----------|------------------------|-------------------|
| John F. Seibert | $50,000.00** | 5.88 | 5.88 |
| Ted Vosburg | $50,000.00** | 5.88 | 5.88 |
| Marc Gabrielson | $50,000.00** | 5.88 | 5.88 |
| Tim Tyrrell | $100,000.00** | 11.76 | 11.76 |

** no capital contribution actually made in exchange for this interest

60.     Seibert, Vosburg and Gabrielson repeatedly told the Plaintiffs that they

had contributed their own money to this and other of their AmericInn hotel projects.  The

Subscription Agreement for the Cedar Rapids Lodge & Suites, LLC, which was signed

by Seibert, Vosburg, Gabrielson, Tyrrell and each of the Plaintiffs supports this

presumption, stating that "[e]ach of the undersigned do hereby subscribe for **and agree to

purchase** an interest in Cedar Rapids Lodge & Suites, LLC" and **"agrees to pay**

**therefore the sum set forth opposite his or her name**, in exchange for the admission of the undersigned as a Member of Cedar Rapids Lodge & Suites, LLC and the transfer to him or her of the membership interest and voting interest therein as set forth below (emphasis added)." The Subscription Agreement shows Seibert, Vosburg, Gabrielson and Tyrrell's "purchased interests" as follows:

| Name | Payment | Profit & Loss Percentage | Voting Percentage |
|------|---------|--------------------------|-------------------|
| John F. Seibert | $50,000.00 | 5.88 | 5.88 |
| Ted Vosburg | $50,000.00 | 5.88 | 5.88 |
| Marc Gabrielson | $50,000.00 | 5.88 | 5.88 |
| Tim Tyrrell | $100,000.00 | 11.76 | 11.76 |

61.     Seibert, Vosburg and Gabrielson later confirmed again, in writing, in a January 10, 2005 mailing to the plaintiffs, that each of them (Seibert, Vosburg and Gabrielson) had made an initial $50,000 capital contribution "payment," buying them a 5.88 percent stake in the LLC, and that Tyrrell had made a $100,000 capital contribution "payment," earning him an 11.76 percent stake in the LLC, when none of these payments had actually been made.

### Self-Dealing/Management Agreement

62.     Without the knowledge of the Plaintiffs, Seibert, on behalf of his hotel management company, JCS Development, Inc. (now known as JFS Development, Inc.) and Gabrielson, on behalf of the Cedar Rapids Lodge & Suites, LLC, then engaged in blatant self-dealing by entering into a management contract ("Management Agreement") for the Cedar Rapids Lodge & Suites. Notwithstanding the fact that the hotel was to have an on-site manager and management staff, this Agreement called for a monthly payment

equal to 4 percent of the hotel's gross monthly revenues "off the top" to compensate Seibert's company, JCS, for unspecified "management" functions, another $700 per month to perform the hotel's bookkeeping and accounting functions, and a $4000.00 flat fee for providing "pre-opening services" to the hotel. [4]

63.    JCS was never exposed to a competitive bidding process or any other due diligence process prior to being selected as the hotel's management company.

64.    The Management Agreement with JCS also contained a self-serving limitation of liability provision that purported to absolve JCS Development, Inc. of any responsibility to the Cedar Rapids Lodge & Suites or its investors for any errors of judgment, acts or omissions by JCS.  This Management Agreement, however, was never negotiated at arms-length, and was never disclosed to the hotel's investors prior to or after their investments in the hotel.  In fact, the terms of this Management Agreement were not known to the investors until the investors wrested control of the hotel away from Seibert, Vosburg and Gabrielson in October 2008.

## Architectural and Construction Problems

65.    Tyrrell signed the construction contract for the Cedar Rapids Lodge & Suites, LLC on December 1, 2003.  Pursuant to that construction contract, the date of commencement of construction for the hotel was fixed as January 1, 2004 or sooner, and the date of substantial completion was set as 210 days from the date of commencement, or July 30, 2004.  The "not to exceed" contract price was fixed at $2,441,900.00.

66.    Despite Seibert's knowledge that Tyrrell was still on probation after pleading out on his felony theft charge, and despite the fact that it was standard industry

---

[4] At an undetermined time, this fee arrangement was unilaterally changed by JCS to a monthly management fee equal to 5% of gross revenue, a $550.00 per month bookkeeping fee, and a $150.00 per month payroll accounting fee.

Case 1:09-cv-00175-LRR   Document 1   Filed 12/03/09   Page 19 of 98

practice to do so, Seibert did not secure a performance bond from Tyrrell to ensure

Tyrell's timely and complete performance on the guaranteed maximum price contract.

As a result, and without their knowledge, Seibert left the Plaintiffs unsecured against any

construction cost overruns by Tyrrell or his subcontractors.

67.     On December 30, 2003, Seibert and Gabrielson, on behalf of the Cedar

Rapids Lodge & Suites, LLC, entered into a $2,550,000.00 Construction Loan

Agreement with Liberty Bank at a variable rate set at ".750 percent above the highest rate

on corporate loans posted by at least 75% of the USA's thirty largest banks known as the

Wall Street Journal Prime Rate" for a period of one year expiring on January 1, 2005.

68.     Pursuant to the terms of this Construction Loan Agreement, the building

was to be "complete" and "free from all mechanics liens and in compliance with building

restrictions and ordinances within **Twelve** months. . . . (emphasis in original).

69.     As of January 1, 2005, if the project had not been completed and the loan

converted to a mortgage, the post-maturity interest rate was scheduled to jump to 18.00

percent.

70.     On December 30, 2003, contemporaneously with signing the Construction

Loan, Seibert and Gabrielson also executed a Pre-Construction Affidavit on behalf of the

Cedar Rapids Lodge & Suites, LLC in which they fraudulently represented to Liberty

Bank that "no work has been started on said premises, either materials delivered or

fabricated for or labor done to this date."  In fact, Seibert and Gabrielson knew that

Tyrrell had been doing site and foundation work on the premises since mid-November

2003.

71.     The December 1, 2003 construction contract between the Cedar Rapids Lodge & Suites and Tyrrell named Lightowler Johnson & Associates, Inc. ("Lightowler Johnson") as the project architects.  Pursuant to that agreement, Lightowler Johnson as the "Project Architect" and/or John Seibert, as the "Owner's Representative," were charged with supervision of Tyrrell's work, the work of his subcontractors, the project in general, and with the release of the partial progress payments used to pay Tyrrell and his subcontractors.

72.     Lightowler Johnson had previously sent a marked up "Standard Form of Agreement Between Owner and Architect for a Small Project" ("Architect's Agreement") to Seibert on June 19, 2003.  Pursuant to Section 1.2 of that Agreement, Lightowler Johnson redlined out their standard obligation to act as the "Owner's Representative" and to provide administration of the Contract between the Owner and Contractor by "visiting the site, reviewing and certifying payments, and reviewing the Contractor's submittals and rejecting nonconforming work."  Lightowler's redlined markup also specifically noted in Section 7.2 that "site visits will only be made upon written request of the owner."

73.     It is not known whether Seibert ever signed this redlined Architect's Agreement on behalf of the Cedar Rapids Lodge & Suites, LLC.  The Plaintiffs were never provided copies of either the Standard Form of Agreement or the unsigned redlined version, or otherwise informed of who had responsibility for project oversight.

74.     Lightowler Johnson did, however, provide a full set of building plans for the AmericInn Cedar Rapids Lodge & Suites to the City of Cedar Rapids Planning Department on November 7, 2003.  These plans were stamped and signed by registered

architect Steve R. Goldade, registered professional engineer Stevan G. Dewald, and licensed professional engineer Winton Johnson, all of Lightowler Johnson.

75. The building plan called for a three-story hotel comprised of 68 guest rooms, although the hotel, as built, contains only 62 rooms.

76. Page A-1.0 of these plans showed that, pursuant to AmericInn's required design standards, the interior walls of the AmericInn Cedar Rapids Lodge & Suites were to be constructed using AmericInn's key marketplace differentiator - its trademarked "Soundguard Technology" of 8'' wide nominal concrete blocks with sound-deadening acoustic foam-filled cores and 5/8'' gypsum board adhered to both sides.

77. Among other things, the plans also showed that the concrete parking lot was to be poured at least 6'' thick, and vapor barrier installed under the foundation slab, under the roof, under the attic floor, and around all exterior walls.

78. Although the AmericInn Construction manual required a 12'' concrete foundation slab, Lightowler Johnson's building plans only called for a 4'' poured concrete foundation slab with a vapor barrier 2 inches beneath it.

79. The plans also called for wood trusses in the attic, and a wood porte-cochere. The plans, however, did not call for the attic and porte-cochere to be sprinkled, as required by NFPA Article 13.

80. The plans also called for a 3.0' high stair railing to the second floor – which is the residential, not commercial standard, and failed to call for a fire-alarmed exit door and exterior concrete pad at the foot of the building's center stairway as required by NFPA Article 13 and the City of Cedar Rapids.

81.    Finally, the plans included a comprehensive exterior landscape plan required and approved by the City of Cedar Rapids Planning Department.  This landscaping was not done prior to the new Governors taking over in October 2008.

82.    By the time foundation work was completed, the project was so undercapitalized that Tyrrell did not have sufficient cash flow to pay for the $6000.00 building permit required by the City of Cedar Rapids Building Department to allow Tyrrell to continue construction.  Seibert nevertheless directed Tyrrell to continue work on the project without the permit.

83.    The City of Cedar Rapids intervened on several occasions, reminded Tyrrell that he needed a building permit to continue construction, and eventually red-tagged the project site for noncompliance and fined Tyrrell $6000.00 – an expense which was later passed through to the investors without their knowledge.

84.    In April 2004, Tyrrell hired Jeff Grannan as the Job Superintendent for the project.  Pursuant to this new chain of command, Grannan reported to Tyrrell, who, in turn, reported to Seibert.

85.    According to Grannan, Tyrrell, who had been touted by Seibert, Vosburg and Gabrielson as having "over 24 years of experience in developing, managing and constructing commercial construction projects" acknowledged to Grannan on several occasions that he (Tyrrell) had never previously handled a commercial construction project.  Grannan also independently knew, from having worked with Tyrrell in the past on single family residence projects, that Tyrrell was a residential builder, and that the Tyrrell Companies were in the business of constructing single family homes as opposed to commercial projects.

86.     According to Superintendent Grannan, the project was so badly underfunded that Tyrrell was forced to hire the least expensive subcontractors available, without regard to their experience or credentials.  Grannan was subsequently forced to fire many of Tyrrell's subcontractors, including four different siding contractors, two tiling subcontractors, and a plumber, many of whom, according to Grannan, either didn't regularly show up for work, or didn't know what they were doing.

87.     Seibert eventually instructed Grannan to stop firing subcontractors because he (Seibert) had already made partial progress payments to them without properly verifying their work.  Although Seibert, Tyrrell and/or Lightowler Johnson were responsible for inspecting work completed by the subcontractors before partial payments were made to them, according to Grannan, no one was regularly supervising the quality and progress of the work being done.

88.     As a result of Tyrrell's inexperience, his indiscriminate hiring of subcontractors and the subsequent lack of oversight by Seibert, Tyrrell and/or Lightowler Johnson, the project experienced many setbacks and cost overruns.  By way of a few examples, truss footings for the pool area roof were off by four feet and had to be destroyed and entirely redone.  Concrete support pillars on either side of the hotel hallways were off 6-8 inches rather than square with each other, and likewise, had to be recast.  The pool area and guest rooms were improperly ventilated.  The roof over the pool was improperly installed and leaked, microwaves and refrigerators could not be installed in their built-in cabinetry because the rooms had been improperly hardwired by the electrical contractors, and the Cat5 cable connection was installed on the walls behind the couches instead of on the walls behind the desks.

89.     Some of the construction problems were even more serious, and have only just been discovered by the new Governors.  By way of example, Tyrrell, with Seibert's knowledge and approval, constructed the interior walls between guest rooms on the first floor out of poured concrete, and used cheaper and unapproved ICF concrete-filled Styrofoam and plastic forms to construct the interior walls between guest rooms on the second and third floors, rather than using AmericInn's more expensive, trademarked SoundGuard Technology.  This unapproved design change was in violation of AmericInn's design standards, cannot be fixed without tearing the hotel down and starting over, and, as such, jeopardizes the hotel's AmericInn franchise affiliation.  The Plaintiffs did not learn of this deficiency until test borings drilled in the walls on November 17, 2009 revealed this problem.

90.     Additional test borings revealed that no vapor barriers had been installed under the foundation slab, under the roof, under the attic floor, or on any of the exterior walls.  This explains why, during periods of heavy rain or high water table readings, the first floor exterior walls and floors leak, resulting in water infiltration and mold growth in certain first floor rooms.

91.     Test borings also showed that the concrete foundation slab was not even poured four inches thick, and that the parking lot was poured less than five inches thick (the plan called for a minimum of six inches) making both susceptible to cracking by frost – which has already occurred.

92.     Finally, the extensive exterior landscape plan required by the City of Cedar Rapids Planning Department was never completed.

93.     Although not fully ascertainable prior to discovery because many of the construction invoices have disappeared from the hotel, construction cost overruns for the project, repairs necessitated by faulty workmanship by Tyrrell and his subcontractors, and incomplete work subsequently paid for by the investors, in total, may easily exceed $500,000.00.

94.     As noted, Seibert, as the "Owner's Representative" for the project, failed to get a performance bond from Tyrrell to ensure the timely completion of all work at or below the guaranteed maximum price.  When asked at an investors' meeting in 2008 why he had failed to do this after some of the construction cost overruns and other construction problems had come to the investors' attention, Seibert stated that he "never" secures a bond from his general contractors before beginning a project.

95.     Several of the building errors and cost overruns can also be attributed to Lightowler Johnson's negligence.

96.     The hotel was planned, designed and approved to contain 68 guestrooms. The hotel was nevertheless only built out with 62 rooms due to unexplained design problems meeting building setbacks.  This change poses a significant perpetual problem to the investors because the radius of protection conveyed to the Cedar Rapids Lodge & Suites by the AmericInn Franchise Agreement requires 60 guest rooms to be actively in service and available for rent.  The loss of six rooms not only significantly affects the hotel's projected income stream, but also jeopardizes this radius of protection in the event that two rooms need to come out of service due, for example, to water infiltration or mold problems.

97.     Further, the designed 36'' elevation of the hotel's central stairway guardrail was designed to comply with residential rather than commercial building code requirements.  The AmericInn Minimum Design Standards and local code required a 42'' guardrail.  The problem was never remedied.

98.     The hotel lacked the rear egress from the building required by code.

99.     The hotel also lacked fire-sprinklers and necessary associated plumbing on the wood trusses in its attic and on the hotel's exterior wooden porte-cochere, and lacked a properly designed handicap access ramp on the sidewalk at the corner of 6th Street and America Ave., all as required by local code and the Americans with Disabilities Act.

100.     Seibert was aware of the many problems occurring during the construction process.  He communicated with Grannan by phone on a regular basis and flew his personal airplane to the Cedar Rapids job site on approximately six occasions to monitor progress.

101.     According to Grannan, Seibert grew so frustrated with Tyrrell that the two ceased speaking to each other, requiring Grannan to act as an intermediary between them. Grannan told Seibert about the many problems associated with the construction of the hotel, but Seibert tied Grannan's hands and simply told Grannan to "get the place open" before the construction loan term expired and the interest rate skyrocketed.

102.     The day before one of Seibert's scheduled visits, the hotel parking lot had not been completed as scheduled.  Because heavy rain was predicted and because concrete work cannot be set in the rain, Grannan sent the concrete subcontractors home. Tyrrell insisted that Grannan call the subcontractors back to the site to complete the work

before Seibert arrived, and over Grannon's objection, Tyrrell ordered the concrete subcontractors to pour the parking lot in the rain.

103.    Because it was poured in the rain, the Cedar Rapids AmericInn parking lot is badly cracked and has failed in many places.  It was also poured to an insufficient minimum depth, making it more susceptible to frost damage.  AmericInn has indicated that it will fail the parking lot on its next inspection if significant and costly repairs are not made to it by the new Governors.

104.    Working capital for the project continued to be so tight that Seibert, without the knowledge or authorization of the investors, tried to pay Grannan for his work as Site Superintendent in room stay credits – an offer which Grannan refused. Seibert did, however, authorize in-kind payments of room credits to other subcontractors without the knowledge of the investors.  These credits were later accounted for as income to the hotel at full "rack rates," requiring cash payments by the hotel to JCS and AmericInn despite the fact that these arrangements produced no actual income to the hotel or its investors.

105.    Although construction was not complete, the hotel had its official Open House and "Opening Day" on December 4, 2004.  At the May 2009 investors' meeting, Seibert claimed that construction had been completed by Opening Day (December 4, 2004) and that "it just needed to be cleaned up."  The bills from the various subcontractors who worked on the hotel tell a different story – showing that Seibert was still signing checks and paying subcontractors for work that was performed at the hotel long after December 4, 2004.  In fact, there is pre-opening construction work at the hotel that has still not been completed.

106.     Prior to opening, Seibert, Gabrielson and Vosburg were provided with a list of significant code deficiencies by the City of Cedar Rapids compliance officer. These deficiencies included the height of the stair guardrail to the second floor, the lack of rear egress from the hotel, noncompliance with the landscape plan, the lack of fire sprinklers on the entrance canopy, and the lack of proper handicap access on the sidewalk.  Because of these deficiencies, the City of Cedar Rapids refused to issue even a temporary Certificate of Occupancy to the hotel.

107.     As of December 4, 2004, the hotel's "Opening Day," Seibert knew that he did not have and would not qualify for a final Certificate of Occupancy from the City of Cedar Rapids due to these significant code deficiencies, but never informed the investors about the hotel failing its compliance inspection, or the liability risks of opening without proper stair guardrails, egress, or fire sprinklers.  He did not even have a temporary Certificate of Occupancy.  Nevertheless, Seibert permitted the hotel to open and guest stays to begin.

108.     Due to its inadequate capitalization by Seibert, Vosburg and Gabrielson, the hotel also opened without all of the furniture, fixtures and equipment ("FF&E") required by the AmericInn Franchise Agreement, Minimum Design Standards and related documents.  This included a lack of appropriate mattresses and couches, and an insufficient supply of linens, pillows, towels, bedspreads, blankets and mattress pads. The hotel also lacked sufficient shampoo and soap, requiring staff members to knowingly violate AmericInn rules by running to the local Walmart to cover these deficiencies.

109.     On December 9, 2004, Cedar Rapids code compliance officer John Hancock granted a 60-day temporary Certificate of Occupancy to the AmericInn Cedar

Rapids Lodge & Suites based on assurances from Seibert and Tyrrell that the code deficiencies would be immediately remedied. This Temporary Certificate of Occupancy was set to expire on February 9, 2005.

110. Liberty Bank converted the Construction Loan to a ten-year, $2,550,000 mortgage on January 1, 2005. The conversion, including all of its terms, was approved by Seibert and Gabrielson on behalf of the Cedar Rapids Lodge & Suites, LLC. It is unknown, prior to discovery, whether anyone from Liberty Bank actually inspected the hotel prior to converting the loan – but Liberty Bank never informed the investors of the property's many code violations and/or its lack of a permanent Certificate of Occupancy.

111. The Liberty Bank loan is a ten-year loan with a variable rate set at 2.750 percent above the Federal Home Loan bank 5-year fixed rate. As of the date of conversion (January 1, 2005), that rate was fixed for 60 months at 6.83%. The terms of the loan allowed the rate to be reset after the 60th payment – which will occur on January 1, 2010. The 2005 rate obligated the Cedar Rapids Lodge & Suites, LLC to make monthly payments of $19,515.00, and a balloon payment of $1,712,579.26 on January 1, 2015.

112. Each of the investors was required to sign a Personal Guaranty as security for the loan. These Personal Guaranties obligate each individual investor, including all of the Plaintiffs, to a principal amount, stated in each guaranty, of a percentage of the $2,550,000.00 debt equal to their percentage interest in the Cedar Rapids, LLC, plus interest, and any attorney's fees, collection costs and enforcement expenses.

113. The hotel's Temporary Certificate of Occupancy expired on February 9, 2005. The City of Cedar Rapids refused to issue a final Certificate of Occupancy to the

hotel until the various problems identified by their code compliance officer were corrected.

114.     The problems were not corrected, but, at Seibert's direction, the hotel nevertheless continued to operate without either a Temporary or Permanent Certificate of Occupancy.

115.     On March 10, 2005, the City of Cedar Rapids sent a letter to Seibert's address in Anoka, Minnesota informing him that the hotel's Temporary Certificate of Occupancy had expired.  Code compliance officer John Hancock followed up with a telephone call to Seibert on April 15, 2005.  During that call, Seibert indicated that Tyrrell had been relieved of his duties as General Contractor, that a different contractor would be taking over the job, and that the code violations would be remedied within approximately 60 days.

116.     On May 11, 2005, Hancock met with Randy Munkvold of HHK Construction, who had been hired by Seibert to complete the unfinished work on the Cedar Rapids Lodge & Suites.  Munkvold promised to send Hancock a timetable for completion of the required work in exchange for Hancock allowing the hotel to remain open.

117.     On May 23, 2005, after no action had been taken, Hancock again talked to Seibert.  This time, Seibert explained that a "legal battle" between Seibert and Tyrrell was slowing down the process of applying for a final Certificate of Occupancy.  Seibert again assured Hancock that he was working on it.  Plaintiffs, however, have uncovered no evidence that Seibert actually took any legal action against Tyrrell.

118.    Nothing further was done on the project for almost a year.  The hotel continued operating without any Certificate of Occupancy during this time, unbeknownst to the hotel's insurance carrier, Liberty Bank, or the Plaintiffs.

119.    On March 9, 2006, Hancock followed up with Jason Keegan, who was the then-manager of the AmericInn Cedar Rapids Lodge & Suites.  Keegan promised to get plans together that week and present them for approval.

120.    On April 3, 2006, Hancock met with Keegan at the hotel to discuss the items remaining to be completed.  At the time, Keegan requested another Temporary Certificate of Occupancy to allow the hotel to continue operating while the code violations were remedied.

121.    On April 7, 2006, the City of Cedar Rapids renewed the hotel's Temporary Certificate of Occupancy.  Once the Temporary Certificate of Occupancy issued, however, neither Seibert nor Keegan took any action to bring the hotel into compliance.

122.    This Temporary Certificate of Occupancy again expired with no action being taken.  The City of Cedar Rapids sent another notice of expiration to Seibert on October 17, 2006.  This time, Seibert did not respond.

123.    Unbeknownst to the hotel's insurance company, Liberty Bank, or the Plaintiffs, the hotel then continued to operate, for the next two years, without any Certificate of Occupancy.

**The Intervening Years**

124.     After the hotel's "Grand Opening" in December 2004, the investors heard virtually nothing from Seibert, Vosburg or Gabrielson about the hotel and/or its operations for more than two-and-a-half years.  There were no quarterly or annual meetings held by the Governors, and there was no communication from the Governors to the other members except for the distribution of the required annual K1s which showed the hotel suffering significant capital losses, and periodic updates on the search for Tyrrell, who had supposedly "disappeared," and whom the Governors were purportedly pursuing for money damages.[5]  Records uncovered by the Plaintiffs, however, reveal that an attorney hired by the Governors was communicating directly with Tyrrell during this period, and that no litigation was ever commenced against Tyrrell.

125.     In light of the hotel's financial difficulties, in March 2007, the hotel's then-Governors instituted a $110,000.00 capital call.  Seibert's letter to the investors of March 12, 2007 notes that this capital call was to be used to satisfy an overdue tax liability of $45,890.00 and to pay off a $65,000.00 "short term note" to Liberty Bank (previously undisclosed to the investors until the March 8, 2007 investors' meeting where it was first discussed).

126.     The $65,000.00 "short term note," however, appears to be a 90-day personal loan to Seibert and Gabrielson made by Liberty Bank on December 29, 2006.  Unlike other Liberty Bank loans and mortgages that listed the Cedar Rapids Lodge & Suites, LLC as the "Borrower," including one for $50,000.00 made only a few months later, this loan lists Seibert and Gabrielson as the "Borrowers," and lists the Cedar Rapids

_____

[5] This claim by Seibert, Vosburg and Gabrielson strains credulity.  Seibert maintained, up until the change of control, that he, Vosburg and Gabrielson "couldn't find" Tyrrell.  Yet in October 2008, Plaintiff James T. Rymes hired a private investigator who found Tyrrell in less than 90 minutes.   Rymes then obtained Tyrrell's proxy to allow the change of control.

Lodge & Suites as additional collateral pledged against the loan. There is no bank documentation to indicate that Seibert and Gabrielson ever loaned this money back to the Cedar Rapids Lodge & Suites, and the loan is not shown anywhere on the Cedar Rapids Lodge & Suites profit and loss statements during the relevant time period.

127. The additional capital contributions made pursuant to this capital call were as follows:

| Name | Percentage* | Capital Call | Paid | Date |
|------|-------------|--------------|------|------|
| Jacob L. Sailer | 6.82% | $7,502.00 | $7,502.00 | 3/22/07 |
| James T. Rymes | 11.77% | $12,947.00 | $12,947.00 | 10/16/08 |
| Pamela J. Cobb, Trustee | 4.12% | $4,532.00 | $4,532.00 | 4/9/07 |
| Jerred Ruble | 4.12% | $4,532.00 | $4,532.00 | 4/10/07 |
| Robert Krieger | Deceased | Deceased | Deceased | Deceased |
| Ray Mulford | 5.88% | $6,468.00 | $6,468.00 | 2008 |
| Michael & Rhonda Coborn | 13.18% | $14,498.00 | $14,498.00 | 5/31/07 |
| Ronald J. Sailer | 2.94% | $3,234.00 | $3,234.00 | 9/12/08 |
| Robert Kopriva | 5.88% | $6,468.00 | Unpaid | Unpaid |
| Scott & Julie Shisler | 5.88% | $6,468.00 | $6,468.00 | 4/9/07 |

Maurice Vosburg (Defendant Ted Vosburg's father), who is not a party to this lawsuit, allegedly made a capital call contribution as shown below:

| Name | Percentage* | Capital Call | Paid | Date |
|------|-------------|--------------|------|------|
| Maurice Vosburg | 5.88% | $6,468.00 | $6,468.00 | 4/9/07 |

Finally, the three individual Defendants, Seibert, Vosburg and Gabrielson claimed to have made the following capital call payments:

| Name | Percentage* | Capital Call | Paid | Date |
|---|---|---|---|---|
| John F. Seibert | 5.88% | $6,468.00 | $6,468.00 | 4/9/07 |
| Ted Vosburg | 5.88% | $6,468.00 | $6,468.00 | 3/13/07 |
| Marc Gabrielson | 5.88% | $6,468.00 | $6,468.00 | 3/13/07 |
| Tim Tyrrell | 11.77% | $12,947.00 | Unpaid | Unpaid |

* Note: the percentage total is 95.88% because this is the total without Robert Krieger's share (4.12%) which was never redistributed to the other investors after Krieger's death as required by the Member Control Agreement

128.    On June 10, 2008, Seibert sent another letter to the investors informing them that the hotel owed $92,201.00 in back real estate taxes and was faced with the prospect of the tax lien going to a tax lien sale where the investors would face a rate of 24% interest per year.  Accordingly, Seibert asked the investors to come to an emergency investors' meeting on June 16, 2008 prepared to "discuss our options on how we are going to handle our back taxes, and our other short term loans from partners that are outstanding."  Seibert offered no explanation as to why the hotel's real estate taxes had not been paid in the ordinary course of business.

129.    At some point between June 10, 2008 and the meeting on June 16, 2008, Maurice Vosburg, Defendant Ted Vosburg's father, agreed to loan the hotel $92,000.00 to pay off the back taxes.  Although never voted on by the investors, Seibert unilaterally bound the investors to pay Vosburg the same 24% interest rate on this money that the investors would have been obligated to pay had the lien been sold.  Seibert approved this interest rate for Vosburg despite the fact that other investors had been paid only 6% interest for making similar loans to the hotel.  Plaintiff James Rymes challenged the fiscal

35

responsibility of this action by Seibert at the June 16, 2008 meeting and was told to "read the agreements – I can do it if I want to."

130.    At the June 16, 2008 meeting, Plaintiff Rhonda Coborn asked Seibert for an accounting of how the $110,000.00 raised from the March 2007 capital call had been used by the Governors.  Incredibly, Coborn was told repeatedly by Seibert, Vosburg and Gabrielson at that meeting that "there had never been a capital call for Cedar Rapids" in 2007.  Coborn insisted that there had been, noting that Vosburg had come to her house personally to pick up the check from her.  Other investors had similar recollections.[6] Seibert, Vosburg and Gabrielson's inability to account for the previous year's capital call or how it had been used was a disturbing wake-up call to the investors.

131.    In light of these revelations, the investors began to more closely scrutinize the hotel's profit and loss statements and balance sheets and, in doing so, discovered a host of unorthodox and questionable entries, including the hotel's cash drawer being reported $8,000.00 short, and "miscellaneous" spending in the amount of $30,000.00 during fiscal year 2007.  When pressed to explain these issues, Seibert was evasive, and claimed not to have the necessary information with him to respond to the questions.

132.    Accordingly, Plaintiff James Rymes requested that another meeting be held in July 2008, and that Seibert, Vosburg and Gabrielson be prepared, at that meeting, to respond to all specific questions posed to them by the investors.

133.    By letter of June 24, 2008, Seibert responded to specific questions posed by investors, but many of his responses were either evasive, inaccurate, or laced with double-talk.

---

[6] The documentary record proves that the investors were correct, as discussed in Paragraphs 125-127 supra.

134.     The investors' frustration with Seibert, Vosburg and Gabrielson mounted at the July 21, 2008 investors' meeting where Seibert's written responses were discussed. In addition, it was becoming obvious that the previous "official minutes" of the investors' meetings, kept by Gabrielson, were not accurately reflecting the discussions that went on at those meetings. At the July 21, 2008 meeting, Seibert did admit that there had been a $110,000 capital call for the Cedar Rapids Lodge & Suites in 2007, but could not account for how the money had been used. Upon information and belief, this is because nearly all of the money was used to pay off a short-term personal loan to Seibert and Gabrielson – a fact that, for obvious reasons, Seibert could not publicly admit.

135.     On October 16, 2008, the members and Governors held another meeting in Cedar Rapids. At the time of this meeting, only 5 of the 16 exterior lights that illuminated the outside of the hotel (allowing it to be seen from the highway) were functional, and Patrick Hanson, the hotel's then-manager explained to several of the Plaintiffs that this was because he could not get approval from JCS to buy lightbulbs. According to Hanson, by this point, the hotel had so many past-due accounts with suppliers that its accounts were being shut down, it was increasingly difficult for the hotel's staff to acquire the things they needed to make the hotel run properly, and every expenditure had to be approved by Seibert at JCS.

136.     Things had gotten so bad that many of the hotel's security and fire prevention features had been stripped for parts needed in other areas of the hotel.

137.     At the October 16, 2008 investors' meeting, Plaintiff James Rymes continued to pressure the hotel's Governors for answers. Rymes asked Vosburg and Gabrielson whether either of them had ever reviewed any of the hotel's financial

statements, and both Vosburg and Gabrielson admitted that they never had. Rymes then made a motion to remove the Governors of the hotel (Seibert, Vosburg, Gabrielson and Tyrrell). The motion was seconded and carried by a vote of 9-2 with one abstention. Rymes then moved to appoint himself as a Governor, which was seconded and approved by a vote of 9-2 with one abstention; moved to appoint Plaintiff Rhonda Coborn as a Governor, which was seconded and approved by a vote of 9-2 with one abstention, and moved to appoint Ron Sailer as a Governor, which was seconded and approved by a vote of 9-2 with one abstention.

138. The newly-elected Governors then immediately revoked JCS's authority to sign checks or pay bills on behalf of the hotel and instructed Seibert that he was no longer entitled to access the business areas of the property.

139. Shortly after the change of control and unbeknownst to the new Governors, however, Seibert ordered then-hotel manager Patrick Hanson (whom he had hired) to package up certain documents belonging to the hotel. These documents were placed in several bankers boxes and stored in the hotel's rear conference room where they were seen by several hotel employees.

140. Hanson instructed then-front desk clerk Kiley Connor to make certain that no one moved the boxes because JCS employee Kevin McPherson would be coming to collect them on Seibert's behalf.

141. Several hotel employees saw these boxes in the conference room, and later saw McPherson remove them from the conference room, load them into his vehicle, and take them from the premises.

142.    Upon information and belief, these boxes contained, among other things, now-missing original equipment specifications, warranty information, original furniture, fixtures and equipment ordering, pricing and delivery records, financial data from the hotel, credit card transaction reports, email correspondence, and preopening checklist reports for the hotel that would help establish the extent of the fraud perpetrated by Seibert, Vosburg and Gabrielson.

143.    The new Governors subsequently discovered that the hotel had been operating for years without a Certificate of Occupancy.  Upon learning this, the new Governors informed JCS by letter of November 24, 2008 that because the hotel had never been issued its required Final Certificate of Occupancy by the City of Cedar Rapids (a condition precedent to the commencement of the Management Agreement with JCS), the new Governors considered the Management Agreement of no effect, and would not honor any fees allegedly due and owing to JCS under the Management Agreement.  The Governors then officially terminated JCS's management responsibilities to the Cedar Rapids Lodge & Suites, LLC.

144.    In the months that followed, after reviewing more of the hotel's financial documents (although due to Seibert's removal of several boxes of financial documents from the premises, the new Governors could not even prepare K1s for fiscal year 2008), the new Governors began to uncover the extent of the fraud, breach of fiduciary duty and rampant mismanagement that had been perpetrated by the Defendants, and the extent of the significant, previously undisclosed liabilities that had accrued against the hotel including:

(a) outstanding liens against the property that had not been paid;

(b) unpaid accounts with area vendors accruing interest and causing the hotel to be barred from ordering further supplies from those vendors;

(c) unpaid taxes;

(d) unpaid franchise fees to AmericInn;

(e) undocumented loans being paid back to Seibert, Vosburg and Gabrielson from the hotel's account;

(f) unexplained differences between actual and reported hotel occupancy rates;

(g) "special arrangements" for rooms with strippers from nearby adult entertainment clubs who were engaging in prostitution activities in the hotel;

(h) free room accommodations being traded for limousine rides, fitness memberships, and other personal benefits to hotel managers and staff;

(i) improper handling and accounting of the hotel's InnPressive Club discounts, resulting in thousands of dollars of discounts being improperly distributed to guests;

(j) improper auditing of AmericInn's monthly franchise fees, Central Reservation System (CRS) charges and Travel Agent Commission Services (TACS) charges resulting in thousands of dollars of overpayments of such fees to AmericInn;

(k) missing records for all credit card transactions;

(l) significant underreporting by the former Governors of construction cost overruns paid to Tyrrell and various subcontractors despite the existence of a guaranteed maximum contract;

(m) significant undercapitalization of the hotel's furniture, fixtures and equipment budget upon opening;

(n) significant undercapitalization for routine maintenance and upkeep;

(o) various misrepresentations by Seibert, Vosburg and Gabrielson, including but not limited to misrepresentations about monies contributed by Seibert, Vosburg and Gabrielson as part of the initial round of equity and subsequent capital calls;

(p) entry into various self-dealing agreements and arrangements, including the Management Agreement with JCS, without proper authorization from the investors;

(q) failure to properly, timely and truthfully inform the investors about the financial condition of the hotel, including, by way of example, failing to inform the investors of written default letters received by Seibert from AmericInn threatening to revoke the hotel's Franchise Agreement and to commence legal action against the individual investors to recover unpaid franchise fees; and

(r) failure to make timely mortgage payments on the Liberty Bank note 46 out of 47 times (each time paying the monthly payment 2-14 days late and thus incurring significant additional interest charges on 46 different occasions, and 3 times paying more than 10 days late – incurring an additional $975.00 late payment penalty each time) and failing to advise the investors of these late payment penalties.

145.    Forced to respond to all of these instances of mismanagement, the new Governors have faced significant financial challenges simply in keeping the hotel afloat.

146.    Because of the theft of various financial data from the hotel by Seibert and McPherson, the new Governors had to retain a CPA to attempt to construct the balance sheets from 2008 in order to prepare the required Form K-1s and meet their reporting obligations to Liberty Bank.

147.    The new Governors have had to satisfy all of Seibert's unfulfilled obligations to the City of Cedar Rapids, and to mend damaged relationships and rebuild

trust in the Cedar Rapids Building Department in order to obtain the Final Certificate of Occupancy needed to allow the hotel to continue to operate. The Final Certificate of Occupancy for the Cedar Rapids Lodge & Suites was finally issued to the Cedar Rapids Lodge & Suites, LLC on October 26, 2009, after the hotel's new Governors (1) rebuilt the stairway guardrail to code; (2) provided a rear egress from the building; (3) spent more than $14,000.00 on work required by the City of Cedar Rapids to bring the hotel's landscape plan into compliance with the hotel's previously-approved site plan; (4) agreed in writing that by September 1, 2010, the hotel would install the required fire sprinkler system on the attached wooden porte-cochere at the hotel's entrance at an anticipated cost of nearly $10,000.00; and (5) agreed to install a required handicap-access ramp on the sidewalk at the corner of 6th St. and America Ave. at an anticipated cost of nearly $10,000.00.

148.     The new Governors also discovered numerous overdue accounts that had to be brought current, and liens needing to be paid off and discharged.

149.     Most recently, on August 24, 2009, AmericInn again notified the Cedar Rapids Lodge & Suites that the hotel was in material default of its August 11, 2003 Franchise Agreement due to an alleged balance of $210,011.86 in unpaid franchise fees and interest charges. Most of these charges were incurred during Seibert, Vosburg and Gabrielson's tenure as Governors, and had never been disclosed to the other investors at any time, including prior to the first capital call in 2007.

150.     On May 17, 2009, the new Governors called a Special Meeting of the investors to discuss the hotel's obligations to AmericInn International, and to propose a second capital call to pay off various newly discovered expenses and to fund a potential

legal action arising out of the construction and operation of the Cedar Rapids Lodge & Suites, LLC.

151.    At that meeting, pursuant to Section 2.14 of the Operating Agreement of the Cedar Rapids Lodge & Suites, LLC, a Special Litigation Committee, consisting of Governors Jim Rymes and Rhonda Coborn was created to examine potential legal remedies on behalf of the hotel.

152.    At the May 17, 2009 meeting, the investors approved the additional $200,000.00 capital call to pay off various newly discovered expenses and to fund legal due diligence into possible claims against JCS, the former Governors of the Cedar Rapids Lodge & Suites, the City of Cedar Rapids, Liberty Bank, AmericInn, and others.  The additional capital contributions made by the Plaintiff-investors pursuant to this capital call were as follows:

| Name | Percentage* | Capital Call | Paid | Date |
|------|-------------|--------------|------|------|
| Jacob L. Sailer | 6.82% | $13,640.00 | $13,640.00 | unknown |
| James T. Rymes | 11.77% | $23,540.00 | $23,540.00 | 5/17/09 |
| Pamela J. Cobb, Trustee | 4.12% | $8,240.00 | $8,240.00 | 6/12/09 |
| Jerred Ruble | 4.12% | $8,240.00 | | |
| Robert Krieger | Deceased | Deceased | Deceased | Deceased |
| Ray Mulford | 5.88% | $11,760.00 | | |
| Michael & Rhonda Coborn | 13.18% | $26,360.00 | $13,360.00 | unknown |
| Ronald J. Sailer | 2.94% | $5,880.00 | $5,880.00 | unknown |
| Robert Kopriva | 5.88% | $11,760.00 | Unpaid | Unpaid |
| Scott & Julie Shisler | 5.88% | $11,760.00 | $11,760.00 | 6/12/09 |

Maurice Vosburg (Defendant Ted Vosburg's father), who is not a party to this lawsuit, made no capital call contribution to this effort:

| Name | Percentage* | Capital Call | Paid | Date |
|---|---|---|---|---|
| Maurice Vosburg | 5.88% | $11,760.00 | Unpaid | Unpaid |

The three individual Defendants, Seibert, Vosburg and Gabrielson and Tim Tyrrell also made no capital call contributions.

| Name | Percentage* | Capital Call | Paid | Date |
|---|---|---|---|---|
| John F. Seibert | 5.88% | $11,760.00 | Unpaid | Unpaid |
| Ted Vosburg | 5.88% | $11,760.00 | Unpaid | Unpaid |
| Marc Gabrielson | 5.88% | $11,760.00 | Unpaid | Unpaid |
| Tim Tyrrell | 11.77% | $23,540.00 | Unpaid | Unpaid |

* Note: the percentage total is 95.88% because this is the total without Robert Krieger's share (4.12%) which was never redistributed to the other investors as required by the Member Control Agreement

153.    This lawsuit follows the new Governors' period of due diligence.


## COUNT I

### Civil Racketeering/Violation of 18 U.S.C. § 1962(a-c) [RICO]

### (By all Plaintiffs Against Defendants Seibert, Vosburg, Gabrielson, and JCS Development, Inc.)

154.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-153 herein.

44

155.    The Cedar Rapids Lodge & Suites, LLC is an "Enterprise" engaged in and the activities of which affect interstate commerce, to wit: a limited liability company organized under the laws of the State of Minnesota.

156.    Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc. as "persons" defined by 18 U.S.C. § 1961(3), received income directly or indirectly derived from the pattern of racketeering activity described in paragraphs 2-8 and 34-152 supra, and as specifically alleged in paragraphs 158-193 below.  The Defendants used this pattern of racketeering activity to acquire an interest in said Enterprise in violation of 18 U.S.C.A § 1962(a).

157.    Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc., as "persons" defined by 18 U.S.C. § 1961(3), through the pattern of racketeering activity described in paragraphs 2-8 and 34-152 supra, and as specifically alleged in paragraphs 158-193 below, maintained an interest in and control of said Enterprise in violation of 18 U.S.C. § 1962(b).

158.    Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc., as "persons" defined by 18 U.S.C. § 1961(3), and as persons associated with said Enterprise, participated, directly and indirectly, in the affairs of said Enterprise through the pattern of racketeering activity described in paragraphs 2-8 and 34-152 supra, and as specifically alleged in paragraphs 159-193 below, in violation of 18 U.S.C. § 1962(c).

159.    Since at least March 2003, Seibert, Vosburg, Gabrielson and JCS Development, Inc. shared a common purpose while engaged in the fraudulent course of conduct detailed in paragraphs 1-153 supra, and worked together to achieve such a purpose.  The Defendants' common purpose, specifically, was (1) to induce the Plaintiffs

to invest hundreds of thousands of dollars in the AmericInn Cedar Rapids Lodge & Suites through initial investments, capital calls and subsequent personal loans; (2) to enter into a series of self-dealing agreements that were financially advantageous to the Defendants, allowed the Governors to transact business on behalf of the hotel and purportedly insulated the Defendants from personal liability to the LLC or its members for monetary damages for their breaches of fiduciary duty, errors of judgment, or acts or omissions; and (3) to take significant ownership shares in the hotel without ever contributing a dime of their own money in exchange for those shares.

160.    The Defendants' fraudulent nondisclosure of these agreements intentionally kept the Plaintiffs in the dark about the undercapitalization of the hotel, the fact that the Defendants had not actually contributed any capital in exchange for their shares, and about the degree of control the Plaintiffs actually maintained over the Governors and the hotel's management company pursuant to these agreements.  This scheme essentially allowed the Governors to act with impunity, hide the true nature of their operations, and defraud the Plaintiffs from mid-2003 until the change of control in October 2008, while reaping substantial profits and other financial benefits for themselves.

161.    Seibert, Vosburg and Gabrielson's replicated this scheme with dozens of other unsuspecting investors in a whole series of other AmericInn hotels, free-riding on the capital provided by those they induced to invest, and thereby each accruing significant equity positions in each of these other AmericInn hotels, again at no cost to them.  Seibert, Vosburg and Gabrielson's scheme was to accumulate enough of these cost-free equity positions to live on the anticipated profit distributions from the hotels

until the mortgages could be paid off and the hotels sold, either individually or together as a conglomerate, producing a profit windfall for the Defendants.

162.    Seibert, Vosburg, Gabrielson and JCS Development, Inc., operating together and individually, directed and controlled the development, construction and operation of AmericInn Cedar Rapids Lodge & Suites, LLC by: (a) preparing the written investment and marketing materials containing the fraudulent misrepresentations and nondisclosures that were used to solicit the initial investments from the Plaintiffs; (b) compiling the investment and marketing materials and fraudulently omitting from those materials both agreements and specific details, including the fact that none of the founding Governors were actually investing any of their own money, that would have revealed the true nature of the Defendants' scheme; (c) appointing themselves founding Governors of the AmericInn Cedar Rapids Lodge & Suites and, thus, controlling the day-to-day decision making and operations at the hotel and access to the daily, weekly and monthly financials; (d) selecting, negotiating the contract with and overseeing the architectural firm charged with designing the hotel and ensuring the hotel's compliance with local, state and federal code requirements; (e) selecting, negotiating the contract with and overseeing the General Contractor charged with building the hotel, including the responsibility for performing background checks and the decision to make him a founding Governor and significant partner in the LLC; (f) overseeing the management of the day-to-day operations at the hotel, including accounts payable and accounts receivable; (g) overseeing the hotel's accounting and preparing and approving the hotel's financial reports provided to investors; and (h) controlling the flow of information to the investors, including the Plaintiffs.

163.    Defendant Seibert, Vosburg, Gabrielson and JCS's many predicate acts, detailed in paragraphs 165-185 infra., constitute acts of mail fraud under 18 U.S.C. § 1341.  These repeated occurrences of mail fraud perpetrated by Defendant Seibert, Vosburg, Gabrielson and JCS, occurring within ten years of one another, constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(5).

### Violations of 18 U.S.C. § 1341 (Mail Fraud)

#### *Fraudulent Profile of Developers*

164.    Upon information and belief, on or about April 1, 2003,[7] in furtherance of the Defendants' scheme, Defendant John Seibert knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Minnesota or with a private interstate carrier in Minnesota for delivery to:

    a.      Defendant Ted Vosburg in Iowa; and

    b.      Defendant Marc Gabrielson in Iowa

a document intended for subsequent dissemination by Vosburg and Gabrielson to potential investors to induce investment in the AmericInn Cedar Rapids Lodge & Suites. The document, prepared by Seibert, was a profile of the developers (Seibert, Vosburg and Gabrielson) and general contractor (Tyrrell Companies, LLC), which represented that Tyrrell had "over 24 years of experience in developing, managing and constructing commercial construction projects ranging in size from $500K to 7.5 million," that the Tyrrell Companies, LLC had a "clear understanding of the construction of this type of building," and that the construction contracts had a "not to exceed construction cost" that

---

[7] The date is upon information and belief because the Defendants are alleged to have sent or delivered this document between or among themselves.

Case 1:09-cv-00175-LRR   Document 1   Filed 12/03/09   Page 48 of 98

would "determine our construction costs prior to the start of construction."  All of these representations were knowingly false.

165.    According to Tyrrell's own sworn court filing in another case from November 2003, the Tyrrell Companies, LLC were actually "in the business of building single family dwellings," not commercial construction projects.  The Tyrrell Companies had, in fact, never handled a commercial construction project prior to the AmericInn Cedar Rapids Lodge & Suites.

166.    At the time he deposited this document in the mail, Seibert also knew that in 1995, Tyrrell had been charged with felony theft in Minnesota, had pled the charge down to a misdemeanor conviction in Faribault District Court, had been ordered to pay $56,000 in restitution, and was still serving a sentence of 10-years of probation.  Seibert also knew that prior to that, Tyrrell had been charged for a 1987 assault causing bodily injury, was convicted by a jury, and had done jail time in Iowa.  Seibert failed to disclose any of this plainly material information about Tyrrell to the investors, nor did Seibert advise the investors that Tyrrell had not gone through a competitive bidding process or similar due diligence, but had been selected simply because he was the previous holder of the AmericInn franchise for the Cedar Rapids geographic region.  Instead, Seibert assured the investors that Tyrrell had "the ability and dedication to provide a high quality product that meets the requirements of building owners," and then placed Tyrrell in charge of the project's $2.4 million construction loan largely without supervision.

167.    Finally, Seibert represented to the investors that the construction contracts had a "not to exceed construction cost" that would "determine our construction costs prior to the start of construction."  Seibert made this representation to the investors

despite the fact that the construction contract with Tyrrell was not signed until eight months _after_ Seibert made these written representations, and without the performance bond from Tyrrell required to ensure that the investors would have recourse on their "not to exceed" construction contract.

168.    On or about April 15, 2003, in furtherance of the Defendants' scheme and in an effort to induce Plaintiff James T. Rymes to invest in the AmericInn Cedar Rapids Lodge & Suites, Defendant Ted Vosburg knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Iowa, or with a private interstate carrier in Iowa, for delivery to Rymes in New Hampshire this same document describing Tyrrell's talent and experience in commercial construction projects and the security provided to the investors by the "not to exceed construction cost" contract.  This material action was taken with an intent to deceive Rymes about Tyrrell's qualification to construct the hotel.  Rymes subsequently relied on this and other documents sent to him by Seibert, Vosburg and Gabrielson in making his decision to invest in the AmericInn Cedar Rapids Lodge & Suites.

169.    On or about April 15, 2003, in furtherance of the Defendants' scheme and in an effort to induce Plaintiffs Scott Shisler and Julie Shisler to invest in the AmericInn Cedar Rapids Lodge & Suites, Defendant Marc Gabrielson knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Iowa, or with a private interstate carrier in Iowa, for delivery to the Shislers in Illinois this same document describing Tyrrell's talent and experience in commercial construction projects, and the security provided to the investors by the "not to exceed construction cost" contract.  This material action was taken with an intent to deceive

Scott Shisler and Julie Shisler about Tyrrell's qualification to construct the hotel. The Shislers subsequently relied on this and other documents sent to them by Seibert, Vosburg and Gabrielson in making their decision to invest in the AmericInn Cedar Rapids Lodge & Suites.

### *Fraudulent Statements about Developers' Initial Equity Contributions*

170.    Upon information and belief, on or about April 1, 2003,[8] in furtherance of the Defendants' scheme, Defendant John Seibert knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Minnesota or with a private interstate carrier in Minnesota for delivery to:

  a.    Defendant Ted Vosburg in Iowa; and

  b.    Defendant Marc Gabrielson in Iowa

a confidential document then-intended for dissemination by Vosburg and Gabrielson to identified, serious potential investors in the AmericInn Cedar Rapids Lodge & Suites. This document, prepared by Seibert, was an "Introduction" to the project and stated, among other things, that the developers of this property were "pooling their resources" to develop this project, and that the investment group would be "putting 25% equity into the development of the property." These representations were knowingly false.

171.    At the time he deposited this document in the mail, Seibert knew, pursuant to the scheme he, Vosburg and Gabrielson were perpetrating, that neither Seibert nor Vosburg nor Gabrielson nor Tyrrell would actually be investing <u>any</u> seed capital into this, or any of the other hotels in their overall investment scheme. As a result, Seibert also knew that the investment group would not actually be putting "25% equity" into the

---

[8] The date is upon information and belief because the Defendants are alleged to have sent or delivered this document between or among themselves.

development of the Cedar Rapids Lodge & Suites as this document promised. The 25% investor equity number included Seibert's, Vosburg's, Gabrielson's and Tyrrell's shares, and presumed, as the investors were told, that the founding-Governors and general contractor would be contributing actual seed capital in exchange for their shares.

172.    On or about June 1, 2003, in furtherance of the Defendants' scheme and in an effort to induce Plaintiff James T. Rymes to invest in the AmericInn Cedar Rapids Lodge & Suites, Defendant Ted Vosburg knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Iowa, or with a private interstate carrier in Iowa, for delivery to Rymes in New Hampshire this same "Introduction" document representing that the developers would be "pooling their resources" to develop the project, and that the project would be funded by 25% investor equity. This material action was taken with an intent to deceive Rymes about the project's equity/financing ratio. Rymes subsequently relied on this knowingly false representation, and other documents sent to him by Seibert, Vosburg and Gabrielson in making his decision to invest in the AmericInn Cedar Rapids Lodge & Suites.

173.    On or about June 1, 2003, in furtherance of the Cedar Rapids Lodge & Suites, LLC Enterprise and in an effort to induce Plaintiffs Scott Shisler and Julie Shisler to invest in the AmericInn Cedar Rapids Lodge & Suites, Defendant Marc Gabrielson knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Iowa, or with a private interstate carrier in Iowa, for delivery to the Shislers in Illinois this same "Introduction" representing that the developers would be "pooling their resources" to develop the project, and that the project would be funded by 25% investor equity. This material action was taken with an intent

to deceive Scott Shisler and Julie Shisler about the project's equity/financing ratio. The Shislers subsequently relied on this knowingly false representation, and other documents sent to them by Seibert, Vosburg and Gabrielson, in making their decision to invest in the AmericInn Cedar Rapids Lodge & Suites.

174.    On or about January 10, 2005, in furtherance of the Cedar Rapids Lodge & Suites, LLC Enterprise, Defendant John Seibert knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Minnesota, or with a private interstate carrier in Minnesota, for delivery to:

a.      Defendant Marc Gabrielson in Iowa;

b.      Defendant Ted Vosburg in Iowa;

c.      Plaintiff Jacob Sailer in Iowa;

d.      Plaintiff James T. Rymes in New Hampshire;

e.      Plaintiff Pamela J. Cobb Trust in Iowa;

f.      Plaintiff Jerred Ruble in Iowa;

g.      Plaintiffs Ray Mulford and Theresa Mulford in Iowa;

h.      Plaintiffs Rhonda Coborn and Michael Coborn in Iowa;

i.      Plaintiff Ronald Sailer in Iowa; and

j.      Plaintiffs Scott Shisler and Julie Shisler in Illinois

a document entitled "Cedar Rapids Lodge & Suites, LLC Written Action in Lieu of Meeting of Governors and Members." This document, in addressing the buy-out of the late Robert Krieger's interest, included a modification of the original Subscription Agreement. That modification of the original Subscription Agreement was initialed by

Defendants Seibert, Vosburg and Gabrielson, representing that Seibert, Vosburg and Gabrielson had each made an initial "payment" of $50,000.00, and that Tyrrell had made an initial payment of $100,000.00 to the AmericInn Cedar Rapids Lodge & Suites. This material fraudulent misrepresentation was intended to perpetuate the Defendants' earlier fraudulent misrepresentations that Seibert, Vosburg, Gabrielson and Tyrrell would make and had made initial capital contributions to the Cedar Rapids Lodge & Suites, LLC. Neither Seibert nor Vosburg nor Gabrielson nor Tyrrell had made the listed "payments" to the Cedar Rapids Lodge & Suites, LLC for which they were credited. Liberty Bank, where the Cedar Rapids Lodge & Suites, LLC maintains its operating accounts, has no record of these payments ever being made.

### *Misrepresentations and Fraudulent Nondisclosures about Certificate of Occupancy*

175.    Prior to the hotel's Grand Opening, the City of Cedar Rapids' code enforcement division conducted a series of inspections at the hotel and provided Tyrrell, Seibert, Gabrielson and Vosburg with a list of significant code violations that needed to be remedied. These deficiencies included the height of the stair guardrail to the second floor, the lack of sufficient rear egress from the hotel, noncompliance with the landscape plan, the lack of fire sprinklers on the entrance canopy, and the lack of proper handicap access on the sidewalk. Because of these deficiencies, the City of Cedar Rapids refused to issue even a temporary Certificate of Occupancy to the hotel.

176.    On December 9, 2004, Cedar Rapids code compliance officer John Hancock granted a 60-day temporary Certificate of Occupancy to the AmericInn Cedar Rapids Lodge & Suites based on assurances from Seibert and Tyrrell that the aforementioned code deficiencies would be immediately remedied. This Temporary

Certificate of Occupancy expired on February 9, 2005, at which point, no work on these deficiencies had been completed. Neither Seibert not any of the other Defendants made any effort to renew the Temporary Certificate of Occupancy for more than a year.

177. Unbeknownst to the Plaintiffs, the Cedar Rapids Lodge & Suites then operated without a Certificate of Occupancy from February 9, 2005 until April 7, 2006. This exposed the Plaintiffs to a possible uninsured claim by anyone injured on the premises while the hotel operated without a valid Certificate of Occupancy, or the possibility of a cease and desist order issuing from the City of Cedar Rapids, which could have shut down the hotel and resulted in a default on hotel's bank loan – triggering each Plaintiff's personal guaranty for three times the value of their initial investment.

178. On April 7, 2006, after Hancock followed up with the hotel, Seibert requested and the City of Cedar Rapids agreed to renew the hotel's Temporary Certificate of Occupancy. The City agreed to the issuance of this second Temporary Certificate of Occupancy only upon Seibert's assurances that the code deficiencies would be immediately remedied. Once the Temporary Certificate of Occupancy issued, however, Seibert again took no action to actually bring the hotel into compliance.

179. This Temporary Certificate of Occupancy was again allowed to expire without action. The City of Cedar Rapids sent another notice of expiration to Seibert on October 17, 2006. Seibert did not respond.

180. Unbeknownst to the Plaintiffs, the hotel then operated without any Certificate of Occupancy for more than two years. This again exposed the Plaintiffs to a possible uninsured claim by anyone injured on the premises while the hotel operated without a valid Certificate of Occupancy, or the possibility of a cease and desist order

issuing from the City of Cedar Rapids, which could have shut down the hotel and resulted in a default on hotel's bank loan – triggering each Plaintiff's personal guaranty for three times the value of their initial investment.

181.    Despite direct knowledge of continuing problems with the City of Cedar Rapids compliance office and with direct knowledge that the second Temporary Certificate of Occupancy had expired and not been renewed, on February 27, 2007, in furtherance of the Defendants' scheme, Defendant John Seibert knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Minnesota, or with a private interstate carrier in Minnesota, for delivery to:

a.    Defendant Marc Gabrielson in Iowa;

b.    Defendant Ted Vosburg in Iowa;

c.    Plaintiff Jacob Sailer in Iowa;

d.    Plaintiff James T. Rymes in New Hampshire;

e.    Plaintiff Pamela J. Cobb Trust in Iowa;

f.    Plaintiff Jerred Ruble in Iowa;

g.    Plaintiffs Ray Mulford and Theresa Mulford in Iowa;

h.    Plaintiffs Rhonda Coborn and Michael Coborn in Iowa;

i.    Plaintiff Ronald Sailer in Iowa; and

j.    Plaintiffs Scott Shisler and Julie Shisler in Illinois

a letter updating the recipients on the physical and financial condition of the Cedar Rapids Lodge & Suites.  In this letter, Seibert stated that "[w]e have hired an independent contractor to finish a number of projects that were left uncompleted by our former

general contractor. There is <u>one project</u> left to complete which is a revision to the handrail going up to the second floor from the lobby. The city has worked with us on these projects and understands the difficulties that we had with our general contractor." This was a material, fraudulent misrepresentation intended to perpetuate the Plaintiffs' reliance, fueled by Seibert's and the other Defendants' continuing deceptions, that the hotel's physical and financial condition had stabilized and was improving. Seibert knew that there was not just "one project left to complete," but a <u>number</u> of serious outstanding issues that were keeping the City of Cedar Rapids code compliance officer from issuing a Final Certificate of Occupancy. Seibert also knew that these projects would be expensive and difficult to correct. Seibert also misrepresented to the investors that the City of Cedar Rapids was "cooperating" with the hotel since, at the time the letter was issued, the Temporary Certificate of Occupancy had expired without renewal, and the City's code compliance department, by their own admission, had grown extremely frustrated with Seibert, Tyrrell and the entire project. Seibert, however, timed this fraudulent communication in order to set up the $110,000.00 capital call that he knew he was going to solicit only two weeks later.

### *2007 Solicitation for Fraudulent Loan Repayment*

182.    On March 12, 2007, in furtherance of the Defendants' scheme, Defendant John Seibert knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Minnesota, or with a private interstate carrier in Minnesota, for delivery to:

a.    Defendant Marc Gabrielson in Iowa;

b.    Defendant Ted Vosburg in Iowa;

c.        Plaintiff Jacob Sailer in Iowa;

d.        Plaintiff James T. Rymes in New Hampshire;

e.        Plaintiff Pamela J. Cobb Trust in Iowa;

f.        Plaintiff Jerred Ruble in Iowa;

g.        Plaintiffs Ray Mulford and Theresa Mulford in Iowa;

h.        Plaintiffs Rhonda Coborn and Michael Coborn in Iowa;

i.        Plaintiff Ronald Sailer in Iowa; and

j.        Plaintiffs Scott Shisler and Julie Shisler in Illinois

a letter soliciting capital call payments to pay off "a sixty-five thousand dollar short term note due at the end of March" and noting that "[t]ime is of the essence [sic] to get the $65,000.00 short term note taken care of." These representations were plainly material, and were relied upon by the Plaintiffs. This "short term note," however, which was entered into on December 29, 2006, was not shown on the "AmericInn of Cedar Rapids Balance Sheet for Period 13 Ended December 31, 2006," and was, in fact, a personal loan from Liberty Bank to Seibert and Gabrielson, with the "Borrowers" listed as Seibert and Gabrielson, rather than the Cedar Rapids Lodge & Suites, LLC. The Plaintiffs have found no documentation showing the proceeds of this loan ever flowing to the Cedar Rapids Lodge & Suites. As such, it appears that Seibert used this letter to solicit capital call funds, in part, to defraud the Plaintiffs by using the proceeds of that capital call to pay off a personal loan.

*Fraudulent Statements about Developers' Capital Call Contributions*

183.     On June 24, 2008, in furtherance of the Defendants' scheme and in an effort to perpetuate the investors' misapprehension and reliance that Seibert, Vosburg and Gabrielson were making cash contributions to the Cedar Rapids Lodge & Suites so that the investors would similarly make these contributions, Defendant John Seibert knowingly placed or caused to be placed in a post office or authorized depository for the United States Postal Service in Minnesota, or with a private interstate carrier in Minnesota for delivery to:

    a.     Defendant Marc Gabrielson in Iowa;

    b.     Defendant Ted Vosburg in Iowa;

    c.     Plaintiff Jacob Sailer in Iowa;

    d.     Plaintiff James T. Rymes in New Hampshire;

    e.     Plaintiff Pamela J. Cobb Trust in Iowa;

    f.     Plaintiff Jerred Ruble in Iowa;

    g.     Plaintiffs Ray Mulford and Theresa Mulford in Iowa;

    h.     Plaintiffs Rhonda Coborn and Michael Coborn in Iowa;

    i.     Plaintiff Ronald Sailer in Iowa; and

    j.     Plaintiffs Scott Shisler and Julie Shisler in Illinois

a letter answering a series of questions posed by investors and enclosing a table showing that Seibert made a $6,468.00 capital call payment on March 13, 2007, Gabrielson made a $6,468.00 capital call payment on March 13, 2007, and Vosburg made a $6,468.00 capital call payment on April 9, 2007.  These representations were knowingly false, as

Liberty Bank shows no record of any such payments having been made into the Cedar Rapids Lodge & Suites account.

184.    The allegations in Paragraphs 154 - 184 are likely to have additional evidentiary support, and the Plaintiffs may well be able to add additional specific predicate acts after a reasonable opportunity for investigation and discovery.  The allegations in Paragraphs 154 - 184 are limited to what the Plaintiffs have been able gather through their own internal investigations of documents remaining at the hotel, or sent to the Plaintiffs.  Defendants improperly caused hotel-related email accounts to be deleted at the time of the change of control on October 23, 2008, and ordered then-Manager Patrick Hanson to box up several bankers boxes of hotel-related documents that were subsequently removed from the hotel without the authority of the newly elected Governors by JCS Development, Inc. Vice President Kevin McPherson, significantly hampering Plaintiffs' internal investigations.  Many documents have not been recovered, including documentation of customers' credit card transactions (which would confirm or undermine the hotel's reported occupancy rates), the hotel's required pre-opening checklists (which would confirm or undermine the hotel's compliance with AmericInn's standards), and all of the hotel's invoices for furniture, fixtures and equipment (which would confirm or undermine the hotel's compliance with AmericInn's standards and help confirm whether or not the hotel was undercapitalized) are now missing.

185.    Seibert, Vosburg, Gabrielson and JCS Development's pattern of racketeering activity detailed above was in violation of 18 U.S.C. § 1962(c), and was the direct and proximate cause of the Plaintiffs' injuries to their business and property. Accordingly, the Plaintiffs are entitled, under the provisions of 18 U.S.C. § 1964(c), to

recover treble damages, the costs of bringing this action, pre-judgment interest, and reasonable attorney's fees, all in an amount to be determined at trial.

## COUNT II

### Conspiracy to Engage in Civil Racketeering/Violation of 18 U.S.C. § 1962(a-c) [RICO]

### (By all Plaintiffs Against Defendants Seibert, Vosburg, Gabrielson, and JCS Development, Inc.)

186.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1-185 of this Complaint as if fully set forth herein.

187.    The Defendants, as detailed in Paragraphs 1-153 above, entered into an agreement with each other to engage in a conspiracy to violate 18 U.S.C. § 1962(a-c).  As set forth herein, each Defendant entered into an agreement to join the conspiracy, took acts in furtherance of the conspiracy, and knowingly participated in the conspiracy.

188.    The purpose of the conspiracy was to induce the Plaintiffs and others to invest in the Cedar Rapids Lodge & Suites hotel so that the Defendants could "free-ride" on the capital provided by the people they induced to invest, thereby obtaining significant equity positions in each of these hotels at no cost to the Defendants.  Their scheme was to accumulate enough of these cost-free equity positions to live on the anticipated profit distributions from the hotels until the mortgages could be paid off and the hotels sold off, either individually or together as a conglomerate – producing a windfall for the Defendants.  The conspirators each carried out the scheme and each conspirator was put on notice of the general nature of the conspiracy, that the conspiracy extended beyond the individual role of any single member, and that the conspiratorial venture, the Cedar Rapids Lodge & Suites, LLC, functioned as a continuing unit for a common purpose.

The Defendants, as conspirators, adopted the goal of furthering the Cedar Rapids Lodge & Suites, LLC, and each of the Defendants' interest in the Cedar Rapids Lodge & Suites, LLC was in making profits through each Defendant's role in the Cedar Rapids Lodge & Suites.

189.　The Defendants agreed and conspired to violate 18 U.S.C. § 1962(a-c) by: (1) receiving income derived, directly or indirectly, from a pattern of racketeering activity used to acquire an interest in the Enterprise; (2) maintaining, directly or indirectly, an interest in and control of the Enterprise; and (3) participating, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity; including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

190.　By engaging in the acts and other conduct described in Paragraphs 1-153 above, Defendants have agreed to conspire and did so conspire, in violation of 18 U.S.C. § 1962(d), to engage in the illegal predicate acts, detailed in Paragraphs 154 - 184 above, which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), and otherwise agreed to violate 18 U.S.C. § 1962(a-c).

191.　The Defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled Defendants to induce the Plaintiffs, through fraudulent misrepresentations and nondisclosures, to both initially invest in the Cedar Rapids Lodge & Suites, and then to further induce the Plaintiffs to invest additional sums of money through capital calls, thereby unwittingly assisting the Defendants in amassing significant cash-free equity positions in a number of hotels, including the Cedar Rapids Lodge & Suites, across the United States.

192.    The membership of the conspiracy includes each of the Defendants.  As co-conspirators, each Defendant is liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Plaintiffs that were caused by any members of the conspiracy, regardless of whether the Defendants were themselves directly involved in a particular aspect of the scheme.

193.    As a direct and proximate result of the violations set forth above, Plaintiffs have been injured in their business and property.  The Defendants' violations of 18 U.S.C. § 1962(d) were the proximate cause of these losses.  Under the provisions of 18 U.S.C. § 1962, Plaintiff is entitled to bring this action and recover treble damages, the cost of bringing this suit, pre-judgment interest, and attorney's fees.

## COUNT III

### Petition for Accounting

### (by all Plaintiffs against Seibert, Vosburg and Gabrielson and JCS Development, Inc.)

194.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-193 herein.

195.    From at least May 15, 2003 until October 16, 2008, Defendants managed the Cedar Rapids Lodge & Suites on Plaintiffs' behalf[9] and collected income and accounts incident to that management.

196.    Defendants collected, received and expended funds arising out of the matters entrusted to the Defendants' care, the exact amounts of which are unknown to the Plaintiffs.

---

[9] JCS was not officially terminated until November 24, 2008.

197.    Defendants have failed to make complete accountings for the sums received and paid out by Defendants.

198.    Defendants Seibert, Vosburg and Gabrielson have also, on several occasions, caused loans to be made to the Cedar Rapids Lodge & Suites, LLC and/or to be paid off from proceeds of the Cedar Rapids Lodge & Suites, LLC without sufficient notice or documentation to the other members.  These loans were not subject to any member oversight and appear to have resulted in self-dealing between and among the Defendant Governors and certain other individuals.

199.    Wherefore the Plaintiffs request that the Defendants be ordered to make a complete accounting to the Plaintiffs for all matters involved herein, including specifically an accounting of all loans made to the Company or paid back by the Company from January 1, 2003 until the change of control on October 16, 2008 by (1) providing the minutes of the Governors' meeting where such loans were approved; (2) providing copies of the documents, including cancelled checks or other evidence to confirm the transaction, underlying each loan; (3) providing contemporaneous evidence of the stated purpose of each loan; (4) providing a record of all payments made on each such loan; and (5) providing all documentary evidence establishing how and when each such loan was paid off, including cancelled checks or other evidence to confirm the transaction.  The Plaintiffs also seek a court order that the Defendants return the complete contents of the bankers boxes taken from the Cedar Rapids Lodge & Suites by JCS employee Kevin McPherson, and an order providing such other relief, including damages, interest, costs and attorneys' fees as may be appropriate and equitable under the circumstances.

## COUNT IV

### Petition for Declaratory Judgment
### to Invalidate the Management Agreement between the Cedar Rapids Lodge & Suites, LLC and JCS Development, Inc.

### (by Cedar Rapids Lodge & Suites, LLC against Seibert, Vosburg and Gabrielson, and JCS Development, Inc.)

200.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-199 herein.

201.    Section 3.3 of the Member Control Agreement specifically states that "[u]nless otherwise set forth in this Agreement or the Operating Agreement or Articles of Organization of the Company, Members shall be entitled to vote on all matters in proportion to their Voting Interests. . ."

202.    Neither the Member Control Agreement nor the Operating Agreement nor the Articles of Organization of the Cedar Rapids Lodge & Suites, LLC, specifically or implicitly allowed the Governors to enter into a Management Contract on behalf of the Cedar Rapids Lodge & Suites, LLC, without subjecting that contract to the review and scrutiny and approving vote of the Members.

203.    Nevertheless, on December 15, 2003, after all of the Plaintiffs had invested in the Cedar Rapids Lodge & Suites, LLC, and without a vote of the Members, the Cedar Rapids Lodge & Suites LLC entered into a Management Agreement with JCS Development, Inc. by which JCS Development, Inc. was engaged to manage, operate and maintain the hotel.  JCS Development, Inc. was the hotel management company owned by Defendant John Seibert, who was also one of the four founding Governors of the Cedar Rapids Lodge & Suites, LLC.  The Agreement was signed only by Seibert on behalf of his company, JCS, and by Gabrielson, as the "Secretary" of the Cedar Rapids

Lodge & Suites, LLC, though none of the Plaintiffs has any record of Gabrielson having been voted the "Secretary" of the Company or having otherwise been granted any authority to bind the other Members of the LLC to such an arrangement without their input.

204.    Independent of that infirmity, Section 3.1 ("Initial Term") of the Management Agreement states that the obligations under the Management Agreement "shall commence upon the completion of the construction of the Property **and the issuance of all permits required for the operation of the Property** (emphasis added)."

205.    Due to a number of code violations and other unresolved issues, the City of Cedar Rapids refused to issue the Final Certificate of Occupancy to the Cedar Rapids Lodge & Suites, LLC which would allow the hotel to open and operate legally. These violations and other issues were never corrected by Seibert or JCS, and as such, no Final Certificate of Occupancy was issued to the hotel prior to the termination of JCS's services in November 2008.

206.    A Final Certificate of Occupancy is a permit required by the City of Cedar Rapids for the legal operation of the Cedar Rapids Lodge & Suites. The Final Certificate of Occupancy for the Cedar Rapids Lodge & Suites did not issue until October 26, 2009, after the new Governors spent tens of thousands of additional dollars to resolve a number of remaining compliance issues with the City of Cedar Rapids.

207.    Because there was no vote of the Members authorizing this Agreement as required by the Member Control Agreement, the Plaintiffs request that the Court declare that the Management Agreement was never properly adopted by the Cedar Rapids Lodge & Suites, LLC, that the Agreement is invalid as a matter of law, and that any dispute

between JCS and the Cedar Rapids Lodge & Suites, LLC is not governed by the terms of that Agreement.

208.    Alternatively, the Plaintiffs request that the Court declare that (1) because by its plain language, the obligations under the Management Agreement did not begin until "the completion of the construction of the Property and the issuance of all permits required for the operation of the Property;" (2) because a Final Certificate of Occupancy is a permit required by the City of Cedar Rapids for the operation of the Cedar Rapids Lodge & Suites; (3) because the City of Cedar Rapids refused to issue a Final Certificate of Occupancy to the hotel due to unresolved code violations up to the point of JCS's termination; and (4) because the Final Certificate of Occupancy for the Cedar Rapids Lodge & Suites did not issue until October 26, 2009, the Management Agreement never took effect to govern the relations between the Cedar Rapids Lodge & Suites, LLC and JCS, and that any claims between these parties are governed only by common law, and not by the terms of that contract.

209.    The Plaintiffs also request that the Court provide such other and further relief, including damages, interest, costs and attorneys' fees as may be appropriate and equitable under the circumstances.

## COUNT V

**Petition for Declaratory Judgment
to Invalidate the Self-Serving Limitation of Liability Provisions in the Various
Undisclosed Documents and Operating Agreements of the Cedar Rapids Lodge &
Suites, LLC**

**(by Cedar Rapids Lodge & Suites, LLC against Seibert, Vosburg and Gabrielson,
and JCS Development, Inc.)**

210.     The Plaintiffs hereby re-allege and incorporate by reference the allegations

made in Paragraphs 1-209 herein.

211.     The Articles of Organization of the Cedar Rapids Lodge & Suites, LLC;

the Management Agreement between Defendant JCS and the Cedar Rapids Lodge &

Suites, LLC; and the Operating Agreement of the Cedar Rapids Lodge & Suites, LLC all

contain self-serving indemnification and limitation of liability provisions for the

protection of the Defendants.  These documents, which were prepared entirely by the

Defendants and/or their counsel, were never disclosed to the Plaintiffs prior to the

Plaintiffs' investments and subsequent capital call contributions to the Cedar Rapids

Lodge & Suites, LLC.

212.     Because the Plaintiffs were not made aware of the indemnification and/or

limitation of liability provisions in these agreements, the Plaintiffs never consented to be

bound by these provisions.  As such, the Plaintiffs seek a declaration of this Court that

these indemnification and limitation of liability provisions be stricken from the above-

referenced agreements, or, in the alternative, that the Court declare that these provisions

be null and void or otherwise inapplicable to the Plaintiffs in this action.

213.     Finally, the Plaintiffs request such other and further relief in connection with this count, including damages, interest, costs and attorneys' fees, as may be appropriate and equitable under the circumstances.

## COUNT VI

### Mismanagement by JCS Development, Inc.

### (Claim brought by Cedar Rapids Lodge & Suites, LLC)

214.     The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-213 herein.

215.     Defendant JCS Development, Inc. provided hotel management services to the Cedar Rapids Lodge & Suites, LLC from November 2004 (pre-opening services) until November 24, 2008.  Defendant JCS Development, Inc. owed a duty of care to the Cedar Rapids Lodge & Suites, LLC to perform this function to the level of commonly accepted industry standards of the hotel management industry.

216.     Defendant JCS Development, Inc. breached that duty of care to perform this function to the level of commonly accepted industry standards by, but not limited to: (1) failing to ensure that the hotel was properly outfitted with furniture, fixtures and equipment of sufficient quality and quantity; (2) failing to ensure the hotel's compliance with the requirements and standards of its Franchise Agreement with AmericInn; (3) failing to properly recruit, train, employ and supervise managers and staff to ensure their competence and to confirm that they had the skills for the jobs they were hired to perform; (4) failing to establish a coordinated program for marketing the hotel to the public; (5) failing to initiate and conduct promotion and publicity to attract guests to the hotel; (6) failing to apply for, process, and obtain all licenses and permits required to

operate the hotel; (7) failing to purchase, supervise and coordinate delivery of initial inventories and operating supplies; (8) failing to prepare Annual Plans for the hotel; (9) failing to maintain the building and grounds of the hotel and the related furnishings and equipment in good working order, repair and condition, including interior and exterior cleaning, painting, decorating, landscaping, making all necessary plumbing, electrical and carpentry repairs, maintenance and alterations; (10) failing to enter into and maintain in good standing contracts for utility services, telephone, maintenance, concessions, vendor purchasing agreements as necessary to maintain and operate a first-class facility; (11) failing to ensure that the hotel operated in compliance with all applicable local, state and national laws, rules and regulations; (12) failing to use reasonable efforts to maximize for the Members the profits to be derived from the hotel; (13) failing to consult with and advise Members concerning policies and procedures affecting the operation of the hotel; (14) failing to establish and maintain for the benefit of the Members complete, proper, current and accurate records and books of account reflecting all of the hotel's transactions in accordance with generally accepted accounting principles, including proper invoicing of direct bill accounts, and setting up self-dealing direct bill accounts totaling over $40,000.00 for entities controlled by the Defendants which the Defendants knew were financially unable to pay on those accounts, but which nevertheless generated commissions for JCS and AmericInn and sales taxes; (15) failing to make books and records readily available for inspection upon demand of the Members; (16) failing to hold quarterly meetings; (17) failing to timely pay all bills and expenses incurred in the operation and maintenance of the hotel resulting in the accrual of unnecessary interest charges; (18) failing to timely file all sales and use, property, franchise and income tax

records and returns relating to the hotel and paying all taxes payable thereon promptly;
(19) failing to supervise the purchase, in an economical and timely manner, of all
inventories, equipment, tools, appliances, and other provisions and operating supplies
necessary and proper to maintain and operate the hotel; (20) failing to ensure the safety of
hotel employees and guests by ensuring that the front door lock was functional; and (21)
failing to ensure the safety of hotel guests by ensuring that the lock on the door to the
pool area worked properly.

  217. That the Defendant JCS's mismanagement was the proximate cause of
significant pecuniary loss and damage to the Cedar Rapids Lodge & Suites, LLC; and

  218. That the Cedar Rapids Lodge & Suites, LLC was damaged by JCS's
mismanagement of the hotel in an amount to be proven at trial.

## COUNT VII

**Negligence Against Defendant Lightowler Johnson Associates, Inc.**

**(Claim brought by Cedar Rapids Lodge & Suites, LLC)**

  219. The Plaintiffs hereby re-allege and incorporate by reference the allegations
made in Paragraphs 1-218 herein.

  220. Defendant Lightowler Johnson Associates, Inc. provided architectural and
engineering services, drawn plans, and supervision over the General Contractor and his
subcontractors during the build-out of the Cedar Rapids Lodge & Suites.  Defendant
Lightowler Johnson Associates, Inc. owed a duty of care to the Cedar Rapids Lodge &
Suites to perform these functions to the level of commonly accepted industry standards.

221.     Defendant Lightowler Johnson Associates, Inc. breached that duty of care to perform these functions to the levels of commonly accepted industry standards by, among other things (1) providing architectural plans and specifications that failed to conform to local regulations; and (2) releasing staged payments to the General Contractor without confirming that the work done during each stage had been done according to commonly accepted industry standards and conformed to the architectural plans, specifications, and local, state and national regulations.

222.     That the Defendant Lightowler Johnson Associates, Inc.'s negligence was a proximate cause of damage to the Cedar Rapids Lodge and Suites, LLC; and

223.     That the Cedar Rapids Lodge and Suites, LLC was damaged by Lightowler Johnson Associates, Inc.'s negligent actions in an amount to be proven at trial.

## COUNT VIII

**Intentional Misrepresentation/Fraud
against Defendants Seibert, Vosburg, Gabrielson
and JCS Development, Inc.**

**(Direct Action by Individually-Named Plaintiffs)**

224.     The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-223 herein.

225.     That the Defendants made false written and oral representations of material facts susceptible of knowledge as specifically alleged in Paragraphs 1-153 above in inducing the Plaintiffs, as individuals, to invest money in the Cedar Rapids Lodge & Suites, LLC; and

226. That the Defendants made these written and oral representations to the individually-named Plaintiffs with knowledge of their falsity or without knowledge of whether the representations were actually true or false; and

227. That the Defendants made these written and oral representations to the individually-named Plaintiffs with the intention to induce the individually-named Plaintiffs to act in reliance thereon; and

228. That these written and/or oral representations, in fact, caused the individually-named Plaintiffs to act in reasonable reliance thereon; and

229. That the Defendants' conduct constituted a willful and wanton disregard for the rights of the Plaintiffs, and that the individually-named Plaintiffs suffered direct, specific and individual pecuniary damages as a result of their reliance upon these written and/or oral representations in an amount to be shown at trial.

## COUNT IX

**Fraudulent Nondisclosure**
**Against Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc.**

**(Direct Action by Individually-Named Plaintiffs)**

230. The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-229 herein.

231. The Defendants concealed from the Plaintiffs facts material to the transactions and agreements at issue in this case, and to the initial capitalization and general financial health of the Cedar Rapids Lodge & Suites; and

232. The facts concealed from the Plaintiffs were peculiarly within the Defendants' knowledge; and

233. The Defendants, who had a legal or equitable duty to communicate these facts to the Plaintiffs, knew that the Plaintiffs would act on the presumption that no such facts existed; and

234. That the Defendants' conduct constituted a willful and wanton disregard for the rights of the Plaintiffs, and that the Plaintiffs suffered direct, individual and specific pecuniary damages as a result of the Defendants' fraudulent nondisclosure in an amount to be shown at trial.

## COUNT X

### Intentional Misrepresentation/Fraud
### against Defendants Seibert, Vosburg, Gabrielson
### and JCS Development, Inc.

### (Claim Brought by Cedar Rapids Lodge & Suites, LLC)

235. The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-234 herein.

236. That the Defendants made to the Plaintiffs false written and oral representations of material facts susceptible of knowledge as alleged in Paragraphs 1-153 above while governing and managing the Cedar Rapids Lodge & Suites, LLC; and

237. That the Defendants made these written and oral representations to the Plaintiffs with knowledge of their falsity or without knowledge of whether the representations were actually true or false; and

238. That the Defendants made these written and oral representations to the Plaintiffs with the intention to induce the Plaintiffs to act in reliance thereon; and

239.    That these written and/or oral representations, in fact, caused the Plaintiffs to act in reasonable reliance thereon; and

240.    That the Defendants' conduct constituted a willful and wanton disregard for the rights of the Plaintiffs, and that the Plaintiffs suffered pecuniary damages as a result of their reliance upon these written and/or oral representations in an amount to be shown at trial.


## COUNT XI

**Fraudulent Nondisclosure**
**Against Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc.**

**(Claim Brought by Cedar Rapids Lodge & Suites, LLC)**

241.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-240 herein.

242.    The Defendants concealed from the Plaintiffs facts material to the transactions, agreements and general financial health of the hotel while governing and managing the Cedar Rapids Lodge & Suites, LLC; and

243.    The facts concealed from the Plaintiffs were peculiarly within the Defendants' knowledge; and

244.    The Defendants, who had a legal or equitable duty to communicate these facts to the Plaintiffs, knew that the Plaintiffs would act on the presumption that no such facts existed; and

245.    That the Defendants' conduct constituted a willful and wanton disregard for the rights of the Plaintiffs, and that the Plaintiffs suffered pecuniary damages as a result of the Defendants' fraudulent nondisclosure in an amount to be shown at trial.

## COUNT XII

### Negligent Misrepresentation/Omission
### against Defendants Seibert, Vosburg, Gabrielson
### and JCS Development, Inc.

### (Direct Action by Individually-Named Plaintiffs)

246.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-245 herein.

247.    That the Defendants, in the course of their business and/or in a transaction in which they have a pecuniary interest, supplied false information to and/or withheld materially significant information from the Plaintiffs in inducing the Plaintiffs, as individuals, to invest money in the Cedar Rapids Lodge & Suites, LLC; and

248.    That the Defendants failed to exercise reasonable care in confirming the accuracy of the information supplied to the Plaintiffs and in withholding materially significant information from the Plaintiffs; and

249.    That Plaintiffs justifiably relied on the information communicated to them by the Defendants; and

250.    That the Plaintiffs suffered direct, individual and specific pecuniary damages as a result of their reliance in an amount to be shown at trial.

## COUNT XIII

### Negligent Misrepresentation/Omission
### against Defendants Seibert, Vosburg, Gabrielson
### and JCS Development, Inc.

### (Claim Brought by Cedar Rapids Lodge & Suites, LLC)

251.     The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-250 herein.

252.     That the Defendants, in the course of their business and/or in a transaction in which they have a pecuniary interest, supplied false information to and/or withheld materially significant information from the Plaintiffs; and

253.     That the Defendants failed to exercise reasonable care in confirming the accuracy of the information supplied to the Plaintiffs and in withholding materially significant information from the Plaintiffs; and

254.     That the Plaintiffs justifiably relied on the information communicated to them by the Defendants; and

255.     That the Plaintiffs suffered pecuniary damages as a result of their reliance in an amount to be shown at trial.

### COUNT XIV

### Breach of Fiduciary Duty/Duty of Care
### against Defendants Seibert, Vosburg and Gabrielson

### (Claim Brought by Cedar Rapids Lodge & Suites, LLC)

256.     The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-255 herein.

257.     The Defendants, as Governors of the Cedar Rapids Lodge & Suites, LLC, owed fiduciary duties to the Plaintiffs, as Members of the LLC with inferior access to the LLC's financial and operational information; and

258.     That the Defendants, as more specifically alleged in Paragraphs 1-153 above, failed to properly monitor business operations at the Cedar Rapids Lodge & Suites, LLC; and

259.     That the Defendants, as more specifically alleged in Paragraphs 1-153 above, mismanaged funds of the Cedar Rapids Lodge & Suites, LLC by, among other things, approving improper personal loans to and from the hotel without the approval of the Members, incurring substantial payment penalties and unnecessary interest assessments by failing to prioritize payments carrying such penalties for nonpayment, and jeopardizing the hotel's Franchise Agreement by failing to pay nearly $200,000.00 in franchise fees to AmericInn; and

260.     That the Defendants failed to act in good faith furtherance of their fiduciary duties to the hotel and/or otherwise engaged in incidents of intentional misconduct; and

261.     That the Plaintiffs suffered pecuniary damages as a result of the Defendants' breach of their duties of care in an amount to be shown at trial.

## COUNT XV

**Breach of Fiduciary Duty/Duty of Loyalty
against Defendants Seibert, Vosburg and Gabrielson**

**(Claim Brought by Cedar Rapids Lodge & Suites, LLC)**

262.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-261 herein.

263.    That the Defendants, as Governors of the Cedar Rapids Lodge & Suites, LLC, owed fiduciary duties to the Plaintiffs, as Members of the LLC; and

264.    That the Defendants, as more specifically alleged in Paragraphs 1-153 above, breached their fiduciary duties to the Cedar Rapids Lodge & Suites, LLC, by, among other things, engaging in self-dealing transactions, including (1) approving a one-sided Management Agreement in favor of Seibert's company without subjecting that contract to negotiation and/or oversight by disinterested Members of the LLC or opening up management of the hotel to the competitive bidding process; (2) approving insufficiently documented personal loans with uncontested interest rates to and from the Company for themselves and family members; and (3) withholding specific negative financial information from the other Members of the LLC; and

265.    That the Plaintiffs suffered pecuniary damages as a result of the Defendants' breaches of their fiduciary duties in an amount to be shown at trial.

## COUNT XVI

**Violation of the Consumer Fraud Act**
**against Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc.**

**(Direct Action by Individually-Named Plaintiffs)**

266.     The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-265 herein.

267.     The Defendants are "persons" as defined by the Act; and

268.     The Defendants used false pretenses, false promises, misrepresentations and misleading statements in connection with the sale of initial interests in the Cedar Rapids Lodge & Suites to the individually-named Plaintiffs, in various written and oral communications with the individually-named Plaintiffs, and in soliciting and collecting capital-call contributions from the individually-named Plaintiffs; and

269.     The Defendants intended that the Plaintiffs would rely on those false pretenses, false promises, misrepresentations and misleading statements; and

270.     As a result of the Defendants' actions, the Plaintiffs suffered direct, individual and specific pecuniary damages and should be remunerated by the Defendants for those damages as well as their costs and attorneys fees, in an amount to be shown at trial.

## COUNT XVII

**Violation of the Consumer Fraud Act
against Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc.**

**(Claim Brought by the Cedar Rapids Lodge & Suites, LLC)**

271.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-270 herein.

272.    The Defendants are "persons" as defined by the Act; and

273.    The Defendants, in connection with their management of the Cedar Rapids Lodge & Suites, LLC, used false pretenses, false promises, misrepresentations and misleading statements in various written and oral communications with the Plaintiffs; and

274.    The Defendants intended that the Plaintiffs would rely on those false pretenses, false promises, misrepresentations and misleading statements; and

275.    As a result of the Defendants' actions, the Plaintiffs suffered pecuniary damages, and should be remunerated by the Defendants for those damages as well as their costs and attorneys fees, in an amount to be shown at trial.

## COUNT XVIII

**Waste/Misappropriation of Corporate Assets against Defendants Seibert, Vosburg, Gabrielson and JCS Development, Inc.**

**(Claim Brought by the Cedar Rapids Lodge & Suites, LLC)**

276.    The Plaintiffs hereby re-allege and incorporate by reference the allegations made in Paragraphs 1-275 herein.

277. That the Defendants, in their capacities as Governors and the company charged with managing the day-to-day operations of the Cedar Rapids Lodge & Suites, LLC, owed a duty to the Plaintiffs; and

278. That the Defendants, as more specifically alleged in Paragraphs 1-153 above, breached that duty by wasting and/or misappropriating assets of the LLC, including the Plaintiffs' initial investment proceeds and subsequent capital call contributions; and

279. That as a result of such corporate waste and misappropriation of corporate assets, the Plaintiffs were damaged in an amount to be shown at trial.

## PRAYERS FOR RELIEF

WHEREFORE the Cedar Rapids Lodge & Suites, LLC, and James T. Rymes, Rhonda Coborn, Scott Shisler, Julie Shisler, the Pamela J. Cobb Revocable Trust, Raymond Mulford, Theresa Mulford, Jerred Ruble, Jacob Sailer and Ronald Sailer respectfully request that this Court:

1. Issue Orders of Notice; and

2. Enter judgment in favor of the Plaintiffs against Defendants Seibert, Vosburg, Gabrielson and JCS pursuant to Count I of the Complaint in the amount of treble the damages sustained by the Plaintiffs as a result of the Defendants' racketeering activities, together with interest, costs, and attorneys fees, as permitted by statute; and

3. Enter judgment in favor of the Plaintiffs against Defendants Seibert, Vosburg, Gabrielson and JCS, jointly and severally, pursuant to Count II of the Complaint in the amount of treble the damages sustained by the Plaintiffs as a result of

the Defendants' conspiracy to commit racketeering activities, together with interest, costs, and attorneys fees as permitted by statute; and

4.      Grant the Plaintiffs' Petition for an Accounting in Count III and Order the Defendants to make a complete accounting for all matters involved herein; to return the boxes of documents taken from the Cedar Rapids Lodge & Suites by JCS; to pay to the Plaintiffs all damages, interest, costs and attorneys fees arising therefrom; and award to the Plaintiffs such other and further relief as may be justified under the circumstances; and

3.      Grant the Plaintiffs' Petition for Declaratory Judgment in Count IV and Declare that the Management Agreement between the Cedar Rapids Lodge & Suites, LLC and JCS Development, Inc., by its own terms, never took effect, and that the parties are not bound by the terms of that Agreement; and award to the Plaintiffs such other and further damages, interest, costs and attorneys fees and relief as may be justified under the circumstances; and

4.      Grant the Plaintiffs' Petition for Declaratory Judgment in Count V and Declare the various self-serving indemnification and limitation of liability provisions of the Agreements and Documents not disclosed to the Plaintiffs void; and award to the Plaintiffs such other and further damages, interest, costs and attorneys fees and relief as may be justified under the circumstances; and

5.      Enter judgment in favor of the Plaintiffs against the Defendant JCS pursuant to Count VI of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of Defendant JCS' mismanagement, punitive damages, interest, costs, and attorneys fees; and

6.      Enter judgment in favor of the Plaintiffs against the Defendant Lightowler Johnson pursuant to Count VII of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of Defendant Lightowler Johnson's negligence, together with interest, costs, and attorneys fees; and

7.      Enter judgment in favor of the individually-named Plaintiffs against the Defendants, jointly and severally, pursuant to Count VIII of the Complaint in the amount of all damages sustained by the individually-named Plaintiffs as a result of the Defendants' intentional misrepresentation/fraud, together with punitive damages, interest, costs, and attorneys fees; and

8.      Enter judgment in favor of the individually-named Plaintiffs against the Defendants, jointly and severally, pursuant to Count IX of the Complaint in the amount of all damages sustained by the individually-named Plaintiffs as a result of the Defendants' fraudulent nondisclosure, together with punitive damages, interest, costs, and attorneys fees; and

9.      Enter judgment in favor of the Plaintiffs against the Defendants, jointly and severally, pursuant to Count X of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of the Defendants' intentional misrepresentation/fraud, together with punitive damages, interest, costs, and attorneys fees; and

10.     Enter judgment in favor of the Plaintiffs against the Defendants, jointly and severally, pursuant to Count XI of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of the Defendants' fraudulent nondisclosure, together with punitive damages, interest, costs, and attorneys fees; and

11.     Enter judgment in favor of the individually-named Plaintiffs against the Defendants, jointly and severally, pursuant to Count XII of the Complaint in the amount of all damages sustained by the individually-named Plaintiffs as a result of the Defendants' negligent misrepresentation/omission, together with interest, costs, and attorneys fees; and

12.     Enter judgment in favor of the Plaintiffs against the Defendants, jointly and severally, pursuant to Count XIII of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of the Defendants' negligent misrepresentation/omission, together with interest, costs, and attorneys fees; and

13.     Enter judgment in favor of the Plaintiffs against the Defendants, jointly and severally, pursuant to Count XIV of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of the Defendants' breach of their fiduciary duties, together with punitive damages, interest, costs, and attorneys fees; and

14.     Enter judgment in favor of the Plaintiffs against the Defendants, jointly and severally, pursuant to Count XV of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of the Defendants' breach of their fiduciary duties, together with punitive damages, interest, costs, and attorneys fees; and

15.     Enter judgment in favor of the individually-named Plaintiffs against the Defendants, jointly and severally, pursuant to Count XVI of the Complaint in the amount of all damages sustained by the individually-named Plaintiffs as a result of the Defendants' violation of the Consumer Fraud Act, together with punitive damages, interest, costs, and attorneys fees; and

16.     Enter judgment in favor of the Plaintiffs against the Defendants, jointly and severally, pursuant to Count XVII of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of the Defendants' violation of the Consumer Fraud Act, together with punitive damages, interest, costs, and attorneys fees; and

17.     Enter judgment in favor of the Plaintiffs against the Defendants, jointly and severally, pursuant to Count XVIII of the Complaint in the amount of all damages sustained by the Plaintiffs as a result of the Defendants' waste/misappropriation of corporate assets, together with punitive damages, interest, costs, and attorneys fees; and

18.     Grant to the Plaintiffs such other and further relief as may be deemed just and appropriate.


## **Jury Demand**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

CEDAR RAPIDS LODGE & SUITES, LLC
and
JAMES T. RYMES
RHONDA & MICHAEL COBORN
SCOTT & JULIE SHISLER
PAMELA J. COBB REVOCABLE TRUST
RAYMOND & THERESA MULFORD
JERRED RUBLE
JACOB SAILER
RONALD SAILER


By their attorneys,

**SHEEHAN PHINNEY BASS + GREEN, PROFESSIONAL ASSOCIATION**

Dated: December 3, 2009        By*:*        */s/ Robert H. Miller*
                                               Robert H. Miller, NHBA #13881*
                                               David W. McGrath, NHBA #9147*
                                               1000 Elm Street
                                               PO Box 3701
                                               Manchester NH 03105
                                               Tel: (603) 627-8145
                                               Fax: (603) 641-2380
                                               rmiller@sheehan.com
                                               dmcgrath@sheehan.com

                                               * *Pro Hac Vice Admissions Pending*


**SIMMONS PERRINE MOYER BERGMAN**

                               By:        /s/ Kevin J. Visser / by JMS
                                               Kevin J. Visser, AT0008101
                                               Jason M. Steffens, AT0007580
                                               115 Third Street SE, Suite 1200
                                               Cedar Rapids, IA 52401
                                               Tel: 319-366-7641; Fax: 319-366-1917
                                               kvisser@simmonsperrine.com
                                               jsteffens@simmonsperrine.com

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

AmericInn Cedar Rapids Lodge & Suites, LLC

By its Governors,

Dated: 11/18/09

_____
James T. Rymes

Dated: 11/18/09

_____
Rhonda Coborn

Dated: 11-18-09

_____
Scott Shisler

STATE OF _____Iowa_____

_____Linn_____ COUNTY

Personally appeared the persons signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of their knowledge and belief.



TODD E. HOLVERSON
COMMISSION NUMBER 748120
MY COMMISSION EXPIRES:
07-31-10

_____
Notary Public

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

**James T. Rymes**

Dated: 11 / 18 / 09

STATE OF _____Iowa_____

_____Linn_____ COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

TODD E. HOLVERSON
COMMISSION NUMBER 748120
MY COMMISSION EXPIRES:
07-31-10

Notary Public

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

**Rhonda Coborn**

Dated: 11/18/09

STATE OF ___Iowa___

___Linn___ COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

Todd E. Holverson Notary Public

NOTARIAL SEAL
IOWA
TODD E. HOLVERSON
COMMISSION NUMBER 748120
MY COMMISSION EXPIRES:
07-31-10

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

**Michael Coborn**

Dated: _11-19-2009_ _Michael Coborn_

STATE OF _Iowa_

_Cerro Gordo_ COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.



| JOLYN BERRY |
| Commission Number 713859 |
| My Commission Expires |
| November 30, 2010 |

_Jolyn Berry_
Notary Public

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

**Scott Shisler**

Dated: 11-19-09          _Scott Shisler_

STATE OF ___ILLINOIS___

___LAKE___ COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

_Sharon Duncan_
Notary Public

OFFICIAL SEAL
SHARON DUNCAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/01/10

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

Julie Shisler

Dated: 11-19-09     _Julie Shisler_ (signature)

STATE OF ILLINOIS

LAKE     COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

Sharon Duncan
Notary Public

```
OFFICIAL SEAL
SHARON DUNCAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 10/01/10
```

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

Raymond M. Mulford

Dated: 11/18/09 _Raymond M. Mulford_

STATE OF Iowa

Franklin COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

_Jeanette Clawson_
Notary Public

NOTARIAL SEAL
IOWA

JEANETTE K. CLAWSON
Notarial Seal - IOWA
Commission No. 751530
My Commission Expires
3/3/11

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

Theresa A. Mulford

Dated: 11/18/09       *Theresa A. Mulford*

STATE OF Iowa
Franklin COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

*Jeanette Clawson*
Notary Public

JEANETTE K. CLAWSON
Notarial Seal - IOWA
Commission No. 751530
My Commission Expires
3/3/11

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

**Jerred Ruble**

Dated: 12/2/09

STATE OF _Iowa_

_Cerro Gordo_ COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

_Wendy Carlson_
Notary Public



WENDY CARLSON
Commission Number 171066
MY COMM. EXP. 09|13|11

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

**Jacob Sailer**

Dated: *11-18-2009*    *Jacob L. Sailer*

STATE OF ___Iowa___

___Franklin___ COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

*Jeanette Clawson*
Notary Public



JEANETTE K. CLAWSON
Notarial Seal - IOWA
Commission No. 751530
My Commission Expires
*3-3-11*

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief.

**Ronald Sailer**

Dated: *Nov 18 2009*     *Ronald J Sailer*

STATE OF _Iowa_

_Franklin_ COUNTY

Personally appeared the person signing the above petition and certification, and swore that the foregoing Verified Complaint is true to the best of his/her knowledge and belief.

*Jeanette Clawson*
Notary Public

NOTARIAL SEAL
IOWA

JEANETTE K. CLAWSON
Notarial Seal - IOWA
Commission No. 751530
My Commission Expires
3-3-11