**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| CEDAR RAPIDS LODGE & SUITES, LLC et al., | |
| Plaintiffs, | No. 09-CV-175-LRR |
| vs. | **ORDER** |
| JFS DEVELOPMENT, INC., f/k/a JCS DEVELOPMENT, INC., et al., | |
| Defendants. | |

_____

## *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*   *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*   *SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . *5*

*V.*    *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . *6*
     *A.*    *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
     *B.*    *Project Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
     *C.*    *CRLS-Lightowler Agreement* . . . . . . . . . . . . . . . . . . . . . . *8*
     *D.*    *Project Design, Construction and Completion* . . . . . . . . . . . . . . . *10*

*VI.*   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
     *A.*    *The Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
         *1. Choice of law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*
         *2. Authority* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
         *3. Validity of the Agreement* . . . . . . . . . . . . . . . . . . . . . *17*
     *B.*    *Statutes of Limitations* . . . . . . . . . . . . . . . . . . . . . . . . . . *20*
         *1. North Dakota* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *21*
         *2. Iowa* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

*VII.*   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *25*

# I. INTRODUCTION

The matter before the court is Defendant Lightowler Johnson Associates, Inc.'s "Motion for Summary Judgment" ("Motion") (docket no. 133).

# II. PROCEDURAL HISTORY

On December 3, 2009, Plaintiffs filed an eighty-seven-page, eighteen-count Complaint (docket no. 1). The Complaint arises from the development of an AmericInn hotel ("Hotel") in Cedar Rapids, Iowa. Plaintiffs allege that the former governors of the Hotel fraudulently induced them to invest in the Hotel and proceeded to mishandle the financing, construction and/or management of the Hotel.

Lightowler Johnson Associates, Inc. ("Lightowler") is only named in Count VII of the Complaint.[1] *See* Complaint at 71. Count VII alleges that Lightowler was negligent in, among other things, providing plans and specifications that did not comply with standards and regulations and failing to provide proper oversight during the construction phase. On February 12, 2010, Lightowler filed an Answer (docket no. 42) to the Complaint, claiming that it did not breach any duties to Plaintiffs and asserting affirmative defenses. On July 15, 2011, Lightowler filed the Motion, arguing that Plaintiffs did not file their claim against Lightowler within the applicable statute of limitations and again asserting that it did not breach any duties of care. On September 15, 2011, Plaintiffs filed a Resistance (docket no. 151) to the Motion, and, on September 26, 2011, Lightowler filed a Reply (docket no. 159). On November 7, 2011, United States Magistrate Judge Jon S. Scoles granted Plaintiffs leave to file a supplemental resistance, *see* Order (docket no. 184), which Plaintiffs filed the same day, *see* Supplemental Resistance (docket no. 185). On November 14, 2011, Lightowler filed a Reply (docket no. 186) to the Supplemental Resistance. On

---

[1] The court recognizes that Cedar Rapids Lodge & Suites is the only named plaintiff in Count VII. For ease of reading, however, the court frequently refers to Plaintiffs collectively.

December 8, 2011, the undersigned held a telephonic hearing during which the parties argued specific issues raised in the Motion. *See* Hearing Minutes (docket no. 201). Kevin Visser and Robert Miller represented Plaintiffs. Kevin Caster and Dana Oxley represented Lightowler. Ted Vosburg appeared personally and was represented by Michael Mellaney for the purpose of the pending Motion to Withdraw Reference. John Seibert appeared personally and unrepresented. The Motion is now fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over Plaintiffs' claims against Defendants John F. Seibert, Ted Vosburg and JFS Development, Inc. (f/k/a JCS Development, Inc.) ("JFS Development") arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (a)-(c). Although Lightowler is not a defendant in Plaintiffs' RICO claims, the court has supplemental jurisdiction over Plaintiffs' state law claim against Lightowler. Pursuant to 28 U.S.C. § 1367(a):

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

A federal court has supplemental jurisdiction over all claims in an action, including state law claims, "whenever the federal-law claims and state-law claims in the case derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (alteration in the original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (internal quotation marks omitted). For instance, claims arise from a common nucleus of operative fact when they are "factually interdependent," *Myers v. Richland Cnty.*, 429 F.3d 740,

3

746 (8th Cir. 2005) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379 (1994)); there is "discernable overlap between the operative facts underlying the federal claims and those underlying the appended state claims," *Hunt v. Up N. Plastics, Inc.*, 980 F. Supp. 1042, 1044 (D. Minn. 1997); or remanding the case to state court would "require duplicative evidence to be presented in both the state and federal forum," *Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1122 (N.D. Iowa 2005). In *Schuster*, the court found that it had supplemental jurisdiction over the plaintiffs' state professional negligence claims against their accountants who were also defendants in the underlying RICO claim. 378 F. Supp. 2d at 1119-22. The court reasoned that, because the accountants negligently prepared tax returns and failed to inform the plaintiffs about the tax consequences of high-risk investments and loans and because the same investments were central to the RICO claims, both the state and federal cases would require proof regarding the same investments and loans. *Id.* at 1122.

The court can still have supplemental jurisdiction even when the defendant is not part of the claim giving rise to the federal question jurisdiction. For example, in *Armstrong v. American Pallet Leasing, Inc.*, the court declined to dismiss a claim against U.S. Bank for lack of jurisdiction even though the bank was not a defendant in the underlying RICO claims because the bank's misrepresentations were used to facilitate the RICO fraud. 678 F. Supp. 2d 827, 845-47 (N.D. Iowa 2009).

While the facts of this case differ somewhat from those in *Schuster* and *Armstrong* in that Lightowler is not a defendant in the RICO claim and Plaintiffs are not alleging intentional wrongdoing beyond negligence against Lightowler, the court finds that it has supplemental jurisdiction over Count VII. "'[I]n trying to set out standards for supplemental jurisdiction and to apply them consistently, we observe that, like unhappy families, no two cases of supplemental jurisdiction are exactly alike.'" *Lyon v. Whisman*, 45 F.3d 758, 760 (3d Cir. 1995) (quoting *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857

F.2d 96, 105 (3d Cir. 1988)).

Plaintiffs allege that part of the fraud constituting racketeering activities involves Seibert's misrepresentations and fraudulent nondisclosures regarding the Hotel's construction, specifically that the Hotel did not conform to Cedar Rapids code requirements and, consequently, the Hotel was operating without a certificate of occupancy at certain points following construction. *See* Complaint at ¶¶ 175-181. In their claim against Lightowler, Plaintiffs allege that Lightowler was negligent in failing to design the Hotel according to regulations and failing to properly oversee the general contractor during construction. *See id.* at ¶¶ 219-223. Therefore, Plaintiffs are alleging that Lightowler's negligence facilitated the alleged RICO fraud. Additionally, the facts of the RICO claim and the state negligence claim are interdependent and would require evidence of the Hotel's construction and regulatory compliance in both state and federal proceedings. Because there is a common nucleus of operative facts between the RICO claim and the negligence claim, the court has supplemental jurisdiction over the claim against Lightowler.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011), *petition for cert. filed*, 80 BNA U.S.L.W. 3321 (U.S. Nov. 14, 2011) (No. 11-609) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "'To survive a motion for summary judgment, the nonmoving party must 'substantiate [its] allegations with sufficient probative

evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy.'" *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Plaintiffs and affording them all reasonable inferences, the uncontested material facts are as follows.

### A. Players

Plaintiff Cedar Rapids Lodge & Suites, LLC ("CRLS") is a limited liability company organized in Minnesota with its principal place of business in Cedar Rapids, Iowa. A limited liability company is "a hybrid business entity . . . offering all of its members limited liability as if they were shareholders of a corporation but treating the entity and its members as a partnership for tax purposes." 51 Am. Jur. 2d *Limited Liability Companies* § 1 (footnote omitted).

Plaintiff James T. Rymes is a current CRLS governor and is a citizen of New Hampshire. Plaintiff Scott Shisler is a current CRLS governor. He and his wife, Plaintiff Julie Shisler, are citizens of Illinois. Plaintiff Rhonda Coborn is also a current CRLS governor. She and her husband, Plaintiff Michael Coborn, are citizens of Iowa. Plaintiffs Raymond Mulford, Theresa A. Mulford, Jerred Ruble, Jacob Sailer and Ronald J. Sailer are all citizens of Iowa, and Plaintiff Pamela J. Cobb Revocable Trust is a trust administered in Iowa.

Defendant JFS Development is a hotel management corporation organized in Minnesota with its principal place of business in Minnesota. Defendant Seibert is the president of JFS Development, was an original governor of CRLS and is a citizen of

Minnesota. Defendant Vosburg was an original governor of CRLS and is a citizen of Iowa. Defendant Lightowler is an architectural and engineering corporation with its principal place of business in North Dakota and was the project architect for the Hotel.

## B. *Project Background*

Seibert, Vosburg and Marc Gabrielson[2] were partners in multiple AmericInn hotel projects. Around 2001, the three partners explored the potential for building an AmericInn hotel in Cedar Rapids, Iowa, and discovered that Midwestern Hospitality, Inc. ("Midwestern") already had exclusive rights to develop an AmericInn franchise in Cedar Rapids. Tim Tyrrell and Vern Cooper signed Midwestern's AmericInn franchise agreement as personal guarantors. *See* Plaintiff's Appendix ("Pl. App'x") (docket nos. 151-3 through 151-9) at 53. Lightowler was the architect for Midwestern's AmericInn project, and the two entities executed a "Standard Form of Agreement Between Owner and Architect for a Small Project" ("Midwestern Contract"). *See* Pl. App'x at 58-62.

After Midwestern failed to pay the amount due on the Midwestern Contract, Lightowler initiated legal action against Midwestern to recover the contract amount. After learning that Midwestern was planning to sell its franchise rights to CRLS, Lightowler suspended its legal action against Midwestern and agreed to be the architect for the Hotel. From the time CRLS was organized until 2008, the CRLS governors were John Seibert, Ted Vosburg, Marc Gabrielson and Tim Tyrrell. Seibert was the president and chief manager of CRLS. In March of 2003, Seibert executed the Articles of Organization in Minnesota on behalf of CRLS. In April of 2003, Midwestern transferred its exclusive Cedar Rapids AmericInn franchise rights to CRLS.

---

[2] Gabrielson was dismissed from this action on November 16, 2011. *See* Stipulation for Dismissal as to Defendant Marc Gabrielson (docket no. 181); Order (docket no. 187) (dismissing Gabrielson).

### C. CRLS-Lightowler Agreement

CRLS and Lightowler had an understanding that the CRLS project was a "new engagement, with a new client, under a separate contract," further evidenced by a new project number in Lightowler's records. Plaintiff's Statement of Additional Material Facts ("Pl. Statement of Additional Material Facts") (docket no. 151-2) at ¶ 25; Defendant's Supplemental Appendix ("Def. Supp. App'x") (docket nos. 157-1 and 157-2) at 213-15 (discussing meetings between Seibert and Lightowler about the new project and referencing different project numbers). On June 19, 2003, Lightowler sent Seibert an altered version of its "Standard Form of Agreement Between Owner and Architect for a Small Project" ("Agreement") signed by Lightowler's Vice President, Steve Goldade, *see* Defendant's Appendix ("Def. App'x") (docket nos. 133-3 through 133-6) at 3-5, which Seibert received in June 2003 or shortly thereafter, *see* Def. App'x at 1.

The Agreement identifies the project as "[d]rawings previously prepared for: AmericInn Hotel." *Id.* at 3. Lightowler crossed out several provisions of the Agreement, including the duty to reject nonconforming work and all other construction phase duties except contract interpretation. *See id.* Seibert has no memory of signing the Agreement, and there is no known copy of the Agreement bearing his signature. *See id.* at 1-8; Pl. App'x at 110, 125.3, 138. CRLS's operating agreement states that a contract on behalf of the LLC must be signed by the chief manager, president, vice president or designee. *See* Pl. App'x at 370. However, there is no evidence that Lightowler was aware of this document or CRLS's internal policy.

Seibert stated both at his deposition and in an affidavit that the Agreement was the contract between CRLS and Lightowler. *See* Def. App'x at 1-2; Pl. App'x at 138; Def. Supp. App'x at 148; *see also* Pl. App'x at 110 (fax from Seibert to an attorney referring to the Agreement as "the architectural contract," although admitting that he never signed the document). Stevan Dewald, Lightowler's President and CEO, stated in his affidavit

that, although Seibert never signed the Agreement, CRLS never objected to it.  Def. App'x at 142.  Dewald stated that "Lightowler performed the work under the belief that the owner agreed to the terms in the contract.  We did the work described in the contract and we billed and were paid the fixed sum in the contract."  *Id.*  Furthermore, CRLS paid Lightowler an invoiced amount based on the lump sum payment stated in the Agreement, *id.* at 14-15, and CRLS received the Hotel plans from Lightowler, Pl. App'x at 170.

The Agreement provides for a lump sum fee of $33,800, minus Midwestern's $3000 retainer.  See Def. App'x at 4.  The Agreement also states that, "This Agreement shall be governed by the law of the location of the Architect's office."  *Id.*  Lightowler's office is located in North Dakota.  The price in the Agreement is the same as Midwestern's unpaid lump sum contract amount.  *See* Pl. App'x at 60, 112.  The Agreement also states that Lightowler would make site visits only upon the client's request.  *See* Def. App'x at 5.

The Agreement provides that revisions to the original design "shall be negotiated prior to commencement of the work."  Pl. App'x at 100.  The standard billing rates schedule that was attached to the Agreement did not include billing rates for additional work done by architects and engineers.  *See id.* at 61; Def. App'x at 7.  Lightowler billed Seibert for plan revisions, and Seibert subsequently directed his staff not to pay several of the invoices for these revisions.  *See* Pl. App'x at 151-58 (invoices with handwritten instructions not to pay them).

Seibert testified in his deposition that it was his understanding that Lightowler would ensure compliance with local and federal regulations and notify CRLS if it noticed that something was not up to standards during a site visit.  *See id.* at 133.2-135.  Seibert also stated in his Answer to the Complaint ("Seibert's Answer") (docket no. 78) that the "[d]efendants . . . relied on Lightowler, as the architect, to review the work being performed by [the general contractor], and Lightowler did review . . . the project and would identify any issues which it had with the construction process."  Seibert's Answer

at ¶ 88. Goldade stated during his deposition that, if plans submitted to AmericInn did not comply with standards, Lightowler would fix those problems only at the request of the client. *See* Pl. App'x at 124; *see also* Def. App'x at 4 (architect's duty to reject nonconforming work is crossed out in the Agreement). Seibert testified in his deposition that he understood that Lightowler's duties under the Agreement were to make site visits only at CRLS's request and to notify CRLS if anything was not up to standard during a site visit. *See* Def. Supp. App'x at 149-51. Seibert also testified that struck-through duties were not part of the agreement. *Id.*

### D. Project Design, Construction and Completion

On November 6, 2003, Lightowler sent Seibert building plans for the Hotel. *See* Pl. App'x at 170. The plans contained several designs that did not conform to AmericInn's internal specifications and did not comply with Iowa and Cedar Rapids building codes and regulations. *See* Def. App'x at 16-18, 26-30; Pl. App'x at 253-98. Specifically, the plans included specifications for a 62-room hotel instead of AmericInn's 68 required rooms, included specifications for a 4 inch foundation instead of AmericInn's required 12 inch foundation, failed to include sprinklers in the attic and porte-cochere, included specifications calling for a 3 foot high railing (which is the residential standard height) and failed to include a fire-alarm exit door or exterior concrete pad at the foot of the stairway in violation of Iowa and Cedar Rapids regulations. *See* Complaint at ¶¶ 75, 78-80. Lightowler corrected some of these errors while the project was ongoing.

On November 21, 2003, Shawn Lidberg, the AmericInn project manager, sent Seibert a letter noting various problems with the plans, including the incorrect number of rooms. *See* Def. App'x at 19. Construction was scheduled to commence on January 1, 2004, Complaint at ¶ 65, and was ongoing as of January 20, 2004, *see* Plaintiff's Supplemental Appendix ("Pl. Supp. App'x") (docket no. 185-2) at 476. On July 20, 2004, Gabrielson sent Seibert an email listing several items of concern with the structure of the

Hotel.  *See* Def. App'x at 23.

On July 26, 2004, Lidberg led a site visit of the Hotel, which was attended by Lightowler engineer Tim Olson, various other AmericInn representatives, Seibert, Vosburg, Gabrielson and Tyrrell, who was also the general contractor for the Hotel.  *See* Pl. App'x at 284.  After the July visit, Olson generated a report of the deficiencies with the Hotel's design and construction that were discovered during the walkthrough.  *See id.* at 290.  Both Olson and Lidberg notified Seibert and Tyrrell of the design and construction deficiencies in writing.  *See id.* at 284-91.  Lightowler's last involvement of any kind on the Hotel project was a fax sent to Tyrrell on September 24, 2004.  *See id.* at 297.

Lidberg led another site visit on October 21, 2004, attended by Tyrrell and another AmericInn representative.  *See id.* at 299-304.  Neither Seibert nor any Lightowler representative attended the October site visit.  *See id.*  During the October visit, Lidberg found several more deficiencies and notified Seibert, Tyrrell and Lightowler of those deficiencies in a written report.  *See id.* at 299.  In response to the report of the October site visit, Lightowler sent AmericInn a letter on November 1, 2004, stating that it was not involved in construction administration and was not aware of the problems that Lidberg observed during the walkthrough.  *See id.* at 349.  Seibert and Tyrrell received copies of the letter.  *See id.*

On either December 4 or December 9, 2004, the Hotel opened for business.[3]  The Hotel received a temporary certificate of occupancy on December 9, 2004, pending necessary corrections to the building's construction.  *See id.* at 350, 356-60.  The temporary certificate of occupancy expired on February 9, 2005, and was renewed on April 15, 2005.  *See id.* at 360.  Another temporary certificate of occupancy was issued

---

[3] There is a discrepancy between Plaintiffs' Complaint and Plaintiff's Response to Defendant's Statement of Material Facts as to whether the Hotel's opening day was December 4 or December 9, 2004.  *Compare* Complaint at ¶ 105, *with* Plaintiff's Response to Defendant's Statement of Material Facts (docket no. 151-1) at ¶ 32.

on April 7, 2006, and expired on October 7, 2006. *See id.* at 357. A final certificate of occupancy was denied on October 16, 2006. *See id.* at 360. On March 8, 2007, the Hotel's financial difficulties and an additional capital call were discussed at an investors' meeting. *See* Complaint at ¶ 125. On June 16, 2008, the investors experienced a "wake-up call" when Seibert, Vosburg and Gabrielson could not account for the money obtained from investors as a result of the 2007 capital call. *See id.* at ¶ 130. On October 16, 2008, Plaintiffs gained control of the Hotel from Seibert, Vosburg, Gabrielson and Tyrrell. *See id.* at ¶ 137. After gaining control of the Hotel, Plaintiffs learned that the Hotel had been operating without a certificate of occupancy and that various deficiencies existed in the design and construction of the Hotel. *See* Pl. Statement of Additional Material Facts at ¶ 62; Pl. App'x at 436-40. The Hotel did not receive a final certificate of occupancy until October 26, 2009. *See* Pl. App'x at 361.

## VI. ANALYSIS

In the Motion, Lightowler argues that it is entitled to summary judgment because Plaintiffs' claim is barred under both the North Dakota statute of limitations and the Iowa statute of limitations. Plaintiffs argue that their claim is not barred.

### A. The Agreement

Whether the Iowa statute of limitations or North Dakota statute of limitations applies depends on whether the choice of law provision in the Agreement is enforceable as part of a valid contract between CRLS and Lightowler. Plaintiffs argue that the Agreement is not a contract because it was never signed, and the CRLS internal operating agreement required the president or designee to sign contracts entered into on behalf of CRLS. Plaintiffs also argue that CRLS's payment to Lightowler was a pass-through of Midwestern's debt and did not constitute acceptance of a new contract. Furthermore, Plaintiffs argue that there was no meeting of the minds regarding the terms of the contract because Seibert and Lightowler had different understandings of the duties that were

required of them under the contract, and Seibert refused to pay for Lightowler's subsequent plan revisions. Defendants argue that the Agreement is a binding contract because representatives of both contracting parties agree that it was the contract between them and both parties performed pursuant to its terms. Defendants also argue that the Agreement left the scope and price of future work open to later negotiations, and, therefore, differences in the parties' understanding regarding subsequent plan revisions are not relevant to the question of whether a contract was formed.

The court will first assess which state substantive law controls the question of contract formation. Then, the court will determine whether Seibert had authority to enter into a contract on behalf of CRLS and whether a contract was formed.

### 1. *Choice of Law*

At the outset, the court must determine which state law to apply in assessing the validity of the Agreement. "Federal district courts must apply the choice-of-law rules of the forum state, whether sitting in diversity or deciding federal question cases with supplemental state law claims." *Bendzak v. Midland Nat'l Life Ins. Co.*, 440 F. Supp. 2d 970, 983 (S.D. Iowa 2006). Thus, the court will apply Iowa choice of law rules in determining what state substantive law applies. Iowa has adopted the choice of law test set forth in the Restatement (Second) of Conflicts of Law, which applies either the law that the parties intended to control the agreement or the law of the state with the "most significant relationship." *Cole v. State Auto. & Cas. Underwriters*, 296 N.W.2d 779, 781 (Iowa 1980).

In determining whether the Agreement is a contract between CRLS and Lightowler, the North Dakota choice of law provision in the Agreement does not control because the existence of a binding agreement has not been established. "[A] choice-of-law provision can have no effect until the court determines the validity of the contract itself." *John T. Jones Constr. Co. v. Hoot Gen. Constr. Co.*, 613 F.3d 778, 782-83 (8th Cir. 2010). "The

13

Iowa Court of Appeals has applied Iowa law to determine the existence of a contract without regard to a choice of law provision in the purported contract." *Id.* at 783 (citing *Flanagan v. Consol. Nutrition, L.C.*, 627 N.W.2d 573, 579 (Iowa Ct. App. 2001)). "Once the existence of a contract is determined, the parties' intent as evinced in the choice-of-law provision controls, and [the court] will apply [the law of the state chosen by the parties] to questions of interpretation or construction of the contract." *Id.* at 783 (internal citation omitted).

Thus, the court will use the most significant relationship test to determine which substantive state law to apply regarding contract formation. The most significant relationship test requires the court to consider: "the place where the injury occurred, the place where the conduct causing the injury occurred, the place of domicile, residence, incorporation or business of the parties, and the place where the relationship between the parties is centered." *Bendzak*, 440 F. Supp. 2d at 984. In reviewing these factors, the court notes that the Hotel was constructed in Iowa. Therefore, the alleged injury—economic harm caused by faulty design and construction—occurred in Iowa. Although relevant, consideration of the place of domicile, residence, incorporation or business of the parties are less helpful in this case. Plaintiff CRLS is a Minnesota limited liability company with its primary place of business in Iowa. All of the individual plaintiffs are citizens or residents of Iowa except James T. Rymes, who is a citizen of New Hampshire, and Scott and Julie Shisler, who are citizens of Illinois. Lightowler is a North Dakota firm. Finally, the relationship between the parties is centered in Iowa because the relationship is based upon the construction of an Iowa hotel. While not all of the parties are domiciled in Iowa, after considering all the relevant factors, the court finds that Iowa has the most significant relationship to the case and applies Iowa substantive law to determine the validity of the Agreement.

## 2.    *Authority*

Seibert had authority to accept the Agreement on behalf of CRLS.  At the time the Hotel project began, Seibert was an agent of CRLS.  At the time Plaintiffs' cause of action accrued,[4] "[e]very manager [was] an agent of the limited liability company."  Iowa Code § 490A.702(3)(b) (2003-2008).

There are various types of authority that an agent can have to act on behalf of a principal.  "'Actual authority to act is created when a principal intentionally confers authority on the agent either by writing or through other conduct which, reasonably interpreted, allows the agent to believe that he has the power to act.'"  *Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010) (emphasis omitted) (quoting *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 493 (Iowa 2000)).  "Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing."  *Id.*  Additionally, under the doctrine of estoppel, "[a] principal is liable if he (1) causes a third party to believe an agent has the authority to act, or (2) has notice that a third party believes an agent has the authority and does not take steps to notify the third party of the lack of authority."  *Id.* at 777.  Finally, "a principal may be liable when he knowingly accepts the benefits of a transaction entered into by one of his agents" under the doctrine of ratification.  *Id.*

According to the applicable provision of the Iowa Code,

> [t]he act of any manager with agency authority, including, but
> not limited to, the execution in the name of the limited liability

---

[4] The Iowa legislature enacted the Revised Uniform Limited Liability Company Act that became effective on January 1, 2009.  *See* Iowa Code § 489.101.  The Act includes a savings clause, however, which states that "[t]his chapter does not affect an action commenced, proceeding brought, or right accrued before this chapter takes effect."  *Id.* at § 489.1303.  Because Plaintiffs' cause of action against Lightowler accrued before January 1, 2009, as discussed more fully below, the court applies the Iowa Code provisions in effect at the time Plaintiffs' cause of action accrued.

> company of any instrument, for apparently carrying on in the
> ordinary course the business or affairs of the limited liability
> company shall bind the limited liability company, unless the
> manager so acting has, in fact, no authority to act for the
> limited liability company in the particular matter, and the
> person with whom the manager is dealing has knowledge of
> the fact that the manager has no such authority.

Iowa Code § 490A.702(3)(b) (2003-2008); *see also* Restatement (Third) of Agency § 3.03 cmt. b (2006) ("A principal may also make a manifestation by placing an agent in a defined position in an organization . . . . Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position . . . unless they have notice of facts suggesting that this may not be so.").

Pursuant to the CRLS operating agreement, Seibert, as the president of CRLS, had actual authority to execute contracts for the company by signature. *See* CRLS Operating Agreement, Pl. App'x at 370 ("All . . . contracts and other instruments pertaining to the business and affairs of the Company shall be signed on behalf of the Company by the Chief Manager, or the President, or any Vice President, or by such other person or persons as may be designated from time to time by the Board of Governors."). Furthermore, through organizational resolutions, CRLS gave original governors Seibert and Gabrielson the power to "execute, acknowledge and deliver" bank loan documents. Pl. App'x at 117.

Even if Seibert did not have actual authority to enter into a contract, he did have apparent authority. Seibert was the president of CRLS at the time Lightowler sent him the Agreement, and Plaintiffs have not produced any evidence indicating that Lightowler had notice that, under the operating agreement, CRLS required a signature on its contracts. Furthermore, CRLS is estopped from denying the existence of the contract because it caused Lightowler to believe that Seibert had authority to act and did not take any steps to inform Lightowler otherwise. Finally, CRLS accepted the benefits of the contract by

receiving the plans from Lightowler, thereby ratifying the contract. Therefore, the court finds that Seibert had authority to enter into the contract.

### 3. Validity of the Agreement

The Agreement is an enforceable contract. A valid contract must have both an offer and an acceptance, with acceptance being a "'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 270 (Iowa 2001) (quoting Restatement (Second) of Contracts § 50). "[A]n offer, unaccepted, makes no binding contract, and . . . the acceptance must be on the terms of the offer . . . ." *Hankins v. Young*, 156 N.W. 380, 383 (Iowa 1916). "[A]lthough a party making an offer may specify how it shall be accepted, failing this anything that amounts to a manifestation of the determination to accept is sufficient . . . ." *Anderson v. Armstrong*, 264 N.W.2d 619, 621 (Iowa Ct. App. 1978).

"[A] manifestation of mutual assent is based upon the objective evidence, not the hidden intent of the parties." *Eaton Corp. v. Branson*, 772 N.W.2d 16 (Table), No. 08-1537, 2009 WL 1677239, at *3 (Iowa Ct. App. June 17, 2009) (citing *Heartland Express*, 631 N.W.2d at 268). "'For a contract to be valid, the parties must express mutual assent to the terms of the contract,'" which is "present when it is clear from the objective evidence that there has been a meeting of the minds." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (quoting *Schaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002)). To meet this objective standard, "the contract terms must be sufficiently definite for the court to determine the duty of each party and the conditions of performance." *Id.* "'[A]n agreement need not contain definitely and specifically every fact in detail to which the parties may be agreeing.' The agreement need only be 'certain and unequivocal in its *essential terms*' and 'absolute certainty is not required; only reasonable certainty is necessary.'" *In re Guardianship & Conservatorship of Price*, 571

N.W.2d 214, 216-17 (Iowa Ct. App. 1997) (quoting 17A Am. Jur. 2d *Contracts* ¶¶ 196-197) (holding that a contract was enforceable because the essential terms of the price to be paid and the services to be rendered were defined in the agreement).

If a document is unsigned or signed by only one of the parties, a contract can still be formed if the parties accept by conduct. *See Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 448 (Iowa Ct. App. 1992). "The parties to an unsigned agreement are obligated to abide by the agreement, when the acceptance appears from the acts of the parties." *Id.* (holding that there was an employment contract even though the employee did not sign the agreement because the employee performed pursuant to the agreement and accepted the benefits of the agreement). "In the absence of a statute requiring a signature[5] . . . or an agreement that the contract shall not be binding until it is signed[,] signatures of both parties are not essential for establishment of a binding contract if manifestation of mutual expressions of assent is otherwise shown." *Serv. Emps. Int'l, Local No. 55 v. Cedar Rapids Cmty. Sch. Dist.*, 222 N.W.2d 403, 407 (Iowa 1974) (citing *Henderson v. Henderson*, 114 N.W. 178, 179 (Iowa 1907)).

> The existence of a contract, meeting of the minds, intention to assume an obligation . . . is to be determined not alone from words used, but in the situation, acts, and conduct of the parties, and from their situation and the attending circumstances, and by the inferences which mankind would ordinarily and reasonably draw therefrom.

---

[5] The statute of frauds in either Iowa or North Dakota is not applicable in this case because Lightowler's duties under the contract could potentially be performed in less than one year. *See Shearon v. Boise Cascade Corp.*, 478 F.2d 1111, 1115 (8th Cir. 1973) (holding that, under Iowa law, "an oral contract is not invalidated by the statute of frauds unless, according to the reasonable interpretation of its terms, the contract *requires* that it should not be performed within one year"); *see also Thompson v. N.D. Workers' Comp. Bureau*, 490 N.W.2d 248, 251-52 (N.D. 1992) (holding that, under North Dakota law, "[i]f there is a possibility that an agreement may be performed within one year, the agreement does not have to be in writing").

*LaFontaine v. Developers & Builders, Inc.*, 156 N.W.2d 651, 655-56 (Iowa 1968) (quoting *Kladivo v. Melberg*, 227 N.W. 833, 837 (Iowa 1929) (internal quotation marks omitted). "The existence of the mutual understanding, the proposal, and acceptance may be implied from conduct and circumstances[,] [which] may be shown by circumstantial evidence, or by the admission of the party to be charged." *Siebring Mfg. Co. v. Carlson Hybrid Corn Co.*, 70 N.W.2d 149, 153 (Iowa 1955) (quoting *In re Newson's Estate*, 219 N.W. 305, 307 (Iowa 1928)); *see also Burns Philp Inc. v. Cox, Kliewer & Co., P.C.*, 2000 WL 33361992, No. 4-99-CV-90033, at *3 (S.D. Iowa Nov. 2, 2000) (holding as a matter of law that a choice of law provision in an unsigned agreement was enforceable where an architect sent an owner a written agreement that the owner never signed, but the evidence showed that the owner assented to and performed under the contract and the owner stated in an affidavit that the document was the agreement between the parties). Additionally, if a party accepts the benefits of an unsigned contract, he or she is estopped from denying the existence of the contract because the agreement has been ratified. *See Ross v. Gordon*, 109 N.W.2d 208, 211 (Iowa 1961) (holding that a party could not deny the existence of a contract, even though she did not sign it, because she ratified the contract by her acceptance of payments and benefits under the agreement).

The Agreement is an enforceable contract. Although Seibert never signed the Agreement, both Seibert and Goldade testified that the Agreement was the contract between them for the Hotel project. The Agreement states the services that Lightowler was obligated to provide and the price that CRLS was to pay for those services. Because Lightowler provided CRLS with the Hotel plans and CRLS paid Lightowler for the plans, both parties to the agreement performed under the contract. Consequently, there was acceptance of Lightowler's offer by conduct. Furthermore, Seibert sent a fax to his attorney on May 2, 2005, that referred to the Agreement as the "architectural contract," which indicates that Seibert understood that the Agreement was the controlling agreement

between CRLS and Lightowler. Pl. App'x at 110. Although the Agreement does not define the price and scope of work for subsequent plan revisions, if there were any, the Agreement is sufficiently definite in its essential terms regarding required services and price to become an enforceable agreement. Furthermore, the Agreement contains no language indicating that terms will not be binding unless signed or that all aspects of the agreement between the parties must be expressed in the document.

Plaintiffs claim that CRLS's payment to Lightowler was not acceptance of a new contract, but, rather, a "pass-through" of Midwestern's debt to Lightowler, minus Midwestern's retainer. *See* Pl. Statement of Additional Material Facts at ¶¶ 28-29. This argument, however, is not persuasive because both parties acknowledged that the Agreement represented a new project with a new agreement.

Plaintiffs further argue that there was no meeting of the minds regarding the parties' duties under the contract. The fact that Seibert and Goldade disagreed in their testimony about the duty to reject nonconforming work and the fact that Seibert stated that he relied on Lightowler to check Tyrrell's work are immaterial to the question of contract formation, however. The parties' conduct provided objective evidence of mutual assent to a binding agreement. A finding of mutual assent cannot be based on the hidden intent of the parties. *See Eaton Corp.*, 2009 WL 1677239, at *3. Based on the above discussion, there is no genuine issue of material fact regarding whether the Agreement is a valid contract. Because the Agreement is enforceable, the North Dakota choice of law provision in the contract governs this dispute.

## B. Statutes of Limitations

The court finds that Plaintiffs' cause of action against Lightowler is barred under either the two-year North Dakota statute of limitations or the five-year Iowa statute of limitations. Plaintiffs argue that their claim is not barred under the Iowa statute of limitations because their cause of action did not accrue until the Hotel opened for business

in December of 2004. Plaintiffs also argue that, under the doctrine of adverse domination, neither statute of limitations started running until they took over CRLS in 2008. Defendants argue that Plaintiffs had notice of their cause of action against Lightowler well before the Hotel opened and that neither North Dakota nor Iowa have adopted the doctrine of adverse domination.

### 1.     North Dakota

Because the Agreement contains a choice of law provision stating that North Dakota law governs the agreement, the court applies the North Dakota statute of limitations to Plaintiffs' claim against Lightowler. *See John T. Jones Constr. Co.*, 613 F.3d at 783 ("Once the existence of a contract is determined, the parties' intent as evinced in the choice-of-law provision controls . . . .").

The applicable statute of limitations under North Dakota law is two years. *See* N.D. Cent. Code § 28-01-18(3); *see also Sime v. Tvenge Assocs. Architects & Planners, P.C.*, 488 N.W.2d 606, 609 (N.D. 1992) ("[E]ngineers and architects are professionals for purposes of the two-year statute of limitations for malpractice actions."). "The determination of when a plaintiff's cause of action has accrued is generally a question of fact, but if there is no dispute about the relevant facts, the determination is for the court." *Dunford v. Tryhus*, 776 N.W.2d 539, 541 (N.D. 2009) (quoting *Tarnavsky v. McKenzie Cnty. Grazing Ass'n*, 665 N.W.2d 18, 22 (N.D. 2003)). North Dakota has adopted the discovery rule in determining when a statute of limitations begins to run. *Id.* at 542. "The discovery rule postpones a claim's accrual until the plaintiff knew, or with the exercise of reasonable diligence should have known, of the wrongful act and its resulting injury." *Id.* (quoting *Wells v. First Am. Bank W.*, 598 N.W.2d 834, 838 (N.D. 1999)).

Plaintiffs had notice of their claim before December 3, 2007. The Hotel opened for business on December 4 or December 9, 2004, and, as discussed below, CRLS had notice of the cause of action before the Hotel opened. Plaintiffs do not dispute that CRLS had

notice of its cause of action before December 3, 2007, but urge the court to apply the doctrine of adverse domination[6] to the instant case. Because North Dakota has not adopted the doctrine of adverse domination, the court declines to apply the exception in the instant action. Thus, the court finds that CRLS's cause of action is outside North Dakota's two-year statute of limitations.

### 2.    *Iowa*

The court further finds that, even if the choice of law provision in the Agreement is not enforceable, CRLS had notice of its cause of action against Lightowler before December 3, 2004, and the claim is therefore barred under the Iowa statute of limitations. The applicable Iowa statute of limitations for Plaintiffs' negligence action against Lightowler is five years. *See* Iowa Code § 614.1(4); *see also Iowa Supreme Court Att'y Disciplinary Bd. v. Powell*, 726 N.W.2d 397, 407 (Iowa 2007) (noting that a legal negligence claim for injury to property was subject to a five-year statute of limitations). The statute of limitations for a negligence claim begins to run when "the aggrieved party has a right to institute and maintain a suit." *Chrischilles v. Griswold*, 150 N.W.2d 94, 99 (Iowa 1967), *superseded by statute on other grounds*, Iowa Code § 614.1(9), *as recognized in Langner v. Simpson*, 533 N.W.2d 511, 516-17 (Iowa 1995); *see also Bob McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc.*, 507 N.W.2d 405, 408 (Iowa 1993) ("[N]o cause of action accrues under Iowa law until the wrongful act produces loss or damage to the claimant.").

Iowa has adopted the "discovery rule," which states that "a cause of action based on negligence does not accrue until plaintiff has in fact discovered that he has suffered injury or by the exercise of reasonable diligence should have discovered it." *Chrischilles*,

---

[6] Under the adverse domination doctrine, if agents who dominate a corporation have knowledge of an injury to the corporation, that knowledge will not be imputed to the corporation if the agents themselves are the wrongdoers. *See* 3A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 1306.20.

150 N.W.2d at 100; *see also Hasbrouck v. St. Paul Fire & Marine Ins. Co.*, 511 N.W.2d 364, 367 (Iowa 1993) ("The statute of limitations under the discovery rule begins to run when the injured party discovers the cause of action."). In other words, the injured party must have "'actual or imputed knowledge of the facts that would support a cause of action.'" *Rieff v. Evans*, 630 N.W.2d 278, 291 (Iowa 2001) (quoting *State v. Wilson*, 573 N.W.2d 248, 253 (Iowa 1998)). CRLS is the only plaintiff named in Count VII. Whether CRLS had notice of a negligence claim depends on what notice its officers had "when the information [was] pertinent to the duties of the officer or employee receiving it." *Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 216 (Iowa 1998). Iowa courts have held that, "'[w]hen an incident occurs causing minor injuries and later more serious injuries appear,' the plaintiff's claim for all injuries accrues for purposes of the statute of limitations upon discovery of the first injury." *K & W Electric, Inc. v. State*, 712 N.W.2d 107, 119 (Iowa 2006) (quoting *LeBeau v. Dimig*, 446 N.W.2d 800, 801 (Iowa 1989)).

Other courts have held that the statute of limitations begins to run in the construction context when plaintiffs discover structural damage. *See City of Omaha v. Hellmuth, Obata & Kassabaum, Inc.*, 767 F.2d 457, 460 (8th Cir. 1985) (applying a Nebraska statute of limitations and holding that the statute of limitations began to run when the city learned that a retaining wall was beginning to crack and deteriorate, despite the architect's assurances that the damage was expected, minor and the result of factors other than faulty design); *Roof-Techs Int'l, Inc. v. State*, 57 P.3d 538, 545-46 (Kan. Ct. App. 2002) (holding that a subcontractor's knowledge of asbestos in the roof of a construction project and knowledge that it would cause delays was sufficient knowledge of the injury to start the statute of limitations running on its claim against the project architect, even though the subcontractor did not know the extent of the injury).

Plaintiffs argue that their claim against Lightowler did not accrue until, at the

earliest, the day that the Hotel opened for business because the injury would not accrue until the building was substantially complete. Because Lightowler undertook only the duty to provide design services to CRLS in the Agreement, CRLS's cause of action accrued long before completion of construction. Furthermore, the facts show that Seibert and other CRLS governors received notice of design and construction problems at several points before the Hotel's opening day. Seibert received notice that there were problems with the design of the Hotel as early as November 21, 2003, the date of the letter from AmericInn. All four CRLS governors received notice of design and construction problems during the July site visit, and Seibert and Tyrrell were notified of additional design and construction issues during the October site visit. Lightowler did not do any additional work on the project after September 24, 2004, and Lightowler's November 1, 2004, letter to AmericInn put Seibert on notice that Lightowler did not believe it had any construction administration duties with respect to the Hotel project. The Hotel opened for business on December 4 or December 9, 2004, and it received a temporary certificate of occupancy on December 9, 2004, *see* Pl. App'x at 360.

Because Plaintiffs filed the Complaint on December 3, 2009, Plaintiffs must not have received notice of the claim until after December 3, 2004, for the action to fall within the statute of limitations. The facts regarding CRLS's knowledge of the design and construction issues during the construction process are undisputed. Plaintiffs urge the court to adopt an analysis that the cause of action does not accrue until the building is substantially complete. Iowa courts have not adopted this rule, however, and the court declines to apply this analysis to the present case. Additionally, Iowa has not adopted the doctrine of adverse domination, and the court declines to extend the doctrine to this case. The record shows that the CRLS governors received notice of the facts giving rise to this cause of action on several occasions prior to December 3, 2004. Thus, there is no genuine issue of material fact regarding whether the Iowa statute of limitations has run, and the

action is barred by the Iowa statute of limitations.

## VII. CONCLUSION

In light of the foregoing, the court finds that the Agreement was a contract between the parties, the contract contained a provision stating that North Dakota law governs the agreement and Plaintiffs' claim is barred by the two-year North Dakota statute of limitations. Furthermore, even if the Agreement is not enforceable, Plaintiffs' claim is barred by the Iowa statute of limitations because Plaintiffs had notice of their cause of action before December 3, 2004. Therefore, Lightowler's Motion for Summary Judgment (docket no. 133) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter Judgment in favor of Defendant Lightowler against Plaintiff CRLS. Lightowler's pending Motion in Limine (docket no. 194) is **DISMISSED AS MOOT**.

**IT IS SO ORDERED.**

**DATED** this 6th day of January, 2012.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA